Mr. Montgomery, *pro se.*

Mr. Gregg for defendant.

May 28, 1863.

## SUPREME COURT—IN PROBATE.

IN THE MATTER OF THE ESTATE OF WM. E. GILL, DECEASED.

CO-EXECUTORS having a several right to receive the debts and assets of the estate, are not compellable like co-trustees to join in receipts; but if they do join, it is equivalent to an admission of willingness to be jointly accountable for the money.

Inventories not required to be filed, until after probate of the will, and not regarded as conclusive, but as *prima facie* evidence of the property that has come to the possession or control of the executor.

If there be several executors, it is the duty of all to see that the estate, or the income arising from it, is applied to the purposes designated by the testator, and for negligence in the discharge of this duty, all the executors regarded as responsible.

A, an executor, was allowed by his two co-executors to retain the possession and use of a large sum of money for upwards of two years, without security, payment of interest or any effort whatever on their part to compel its investment or proper application in a due course of administration, although knowledge of the existence of the fund was brought home to all alike : In such a case, the Court, with a due regard for the interests of the minor heir, refused to grant the application of an executor for a discharge until the fund appropriated by the co-executor should have been accounted for.

Before Justice ROBERTSON, at Chambers.

*Per Curiam:* On the petition of John Meek, one of the executors, that he be discharged.

William E. Gill died in Honolulu, on the 9th day of August, 1853, leaving a considerable amount of property, which was disposed of by will, the major part being intended as a provi-

sion for his daughter, Emily. The executors named in the will were, John Meek, Charles W. Vincent and William Wond, who joined in the usual petition for probate, a few days after Mr. Gill's decease. There was an unusually large amount of business in the Probate Court at the time, which caused the hearing of the petition to be delayed. In the meantime, Charles W. Vincent and William Wond filed a petition for the appointment of a receiver, to take charge of the property, until the will could be proved. The Court appointed Charles W. Vincent as such receiver. The will was admitted to probate on the 22d October, 1853, and on the same day John Meek and Charles W. Vincent filed a sworn inventory of the property. In that inventory there appears an item of $2,750 in cash, "on deposit at the Custom House," and the guardian of Emily Gill now objects to the discharge of John Meek from responsibility as executor, until he shall have accounted for the said item of $2,750.

The petitioner avers that, although he participated in the proceedings necessary to obtain probate of the will, and signed the inventory of the estate in conjunction with Charles W. Vincent, yet neither the item of $2,750, nor any other part of the property has ever come to his hands ; and he claims therefore that he cannot be held responsible. No evidence has been given to contradict this averment. On the contrary, Charles W. Vincent testifies that he drew the money deposited at the Custom House, on the 25th of September, 1853, the day after he received his appointment as receiver, which was about four weeks previous to the grant of probate and the filing of the inventory, and that that money never came to the possession of Meek.

It is contended on behalf of the infant devisee, that the executors assumed a joint trust, and are all responsible ; that Meek having joined in filing the sworn inventory, he is conclusively bound by it, and must discharge himself of all the items contained therein, including that of the $2,750, returned as on deposit at the Custom House, before he can be released from responsibility ; and that the executors were bound, as trustees, to have invested that money for the benefit of the infant.

After a careful examination of the authorities referred to by both parties at the hearing, and many others besides, it seems

to me that the question as to the precise limit of the legal responsibility devolved upon co-executors, is one by no means free from doubts and difficulties, even at this late day. The apparent uncertainty on this subject arises no doubt, in great measure, from the same fruitful source as the uncertainty which may be met with in some other instances, namely, from the practical difficulty encountered by Courts in the effort to maintain and enforce, uniformly, rules which while they appear in the abstract, just and reasonable, are sometimes found, from the peculiar circumstances of particular cases, to work harshly and inequitably. In Westly vs. Clarke, Lord Northington, while speaking of the liability of a co-executor, very justly remarked that " equity arises out of a modification of acts, where a very minute circumstance may make a case equitable or iniquitous. And though former authorities may and ought to bind the determination of subsequent cases with respect to rights, as in the right of curtesy or dower ; yet there can be no rule for the future determination of this Court concerning the acts of men."

The law held applicable to the case of co-trustees, appears to be different, at least in the English Courts, from that which prevails with regard to co-executors. The mere fact that trustees, who are authorized to sell lands for money, or to receive money, jointly execute a receipt therefor to the party who is debtor or purchaser, will not ordinarily make either liable, except for so much of the money as has been received by him ; although, ordinarily, in the case of executors, it would be different. Co-executors have a several right to receive the debts due to the estate, and all other assets that may come to their hands, and as the separate receipt of one executor is sufficient to discharge any debtor to the estate, they are not compellable, like co-trustees, to join in receipts, and, consequently, if they do join in a receipt, it is their own voluntary act, and equivalent to an admission of their willingness to be jointly accountable for the money. And so if one executor, after receiving the assets, voluntarily pays them over to his co-executor, he becomes responsible for the due application and administration of those assets by that co-executor. (See Story's Eq. Juris., Vol. 2, Secs. 1280 and 1280 a.) The distinction here referred to is said to be finally established, as a general rule, in the equity jurisprudence of

England, although, perhaps, not universally in that of America. (Story's Eq. Juris., Vol. 2, Sec. 1281.)

The case of Churchill *vs.* Lady Hobson *et al.*, cited by the petitioner, is the earliest case in which the ancient rigor of the rule of accountability, as against co-executors, appears to have been departed from. That case will be found in 1st Salkeld's Reports, p. 318, but is reported more fully in 1st Peere Williams, p. 240. The circumstances of the case were peculiar, for Goodwyn, the executor, who received the funds, and who afterwards became insolvent, had been the testator's banker in his life time, and for a considerable time after testator's death continued to be a person of very great credit with monied people. On that ground, Lord Chancellor Harcourt declined to hold the other executor, Churchill, responsible for £500 paid over by him to Goodwyn, or for other monies in respect of which he had signed the receipts with Goodwyn, receiving from him a note at the time of each payment, acknowledging that Goodwyn alone had received the money. The Lord Chancellor based his judgment also upon another ground, namely, a difference as between creditors and legatees, unfavorable to the latter. The distinction does not appear to have been adopted in subsequent cases, and, indeed, there seems to be no good reason why the rights of legatees, and those claiming under the statute of distribution, should not be as carefully protected as the rights of creditors. The decision in the case just referred to was approved and followed by Lord Northington, in Westley *vs.* Clarke, in which case the Court denied the existence of any distinction as to liability for each other between co-trustees and co-executors, where they join in giving receipts. In Hovey *vs.* Blakeman, (4 Vesey's R. 608,) the Master of the Rolls said he entirely concurred in Westley *vs.* Clark.

On the other hand, in the case of Saddler *vs.* Hobbs, (2 Brown's Ch. Rep. 95,) the estate of a deceased co-executor was held liable for a moiety of £7,000, for which bills were drawn by the two executors jointly, although this was the only act done by the deceased executor, as such. Lord Chancellor Thurlow, in delivering judgment, said, "I take it to be clear, that where, by any act, or any agreement of the one party, money gets into the hands of his companion, whether a co-trustee or co-executor,

they shall both be answerable." "The mind of the Court hath changed, in various instances, in cases of trustees ; but, in cases merely in regard to executors, it has continued invariable." "It has been determined, that where two trustees join in receipts or conveyances, and the one, only, receives the money, that party shall be solely liable, as the other joined purely for the sake of conformity. But, in the case of executors, the rule of law prevailed, and both have been deemed liable. As to Churchill *vs.* Hobson, Lord Harcourt founds his opinion upon a distinction between creditors and legatees. That a creditor shall have a right to charge an executor, and a legatee not, seems to me an odd distinction. In the case of Leigh and Barry, the rule is confirmed, that trustees shall not be chargeable, but that executors shall, under such circumstances as the present. The only case to the contrary is that of Westley *vs.* Clarke, in the time of Lord Northington. There were particular circumstances in that case ; but I much question that determination."

In the case of Chambers *vs.* Minchin (7 Vesey's Rep., 186) Lord Eldon disapproved of the relaxation of the rule as to executors, and held one executor responsible for a loss occasioned by the sale of stock, in which he joined with his co-executor, who received all the money and absconded. In the course of his judgment, the Lord Chancellor, referring to the rule, said, "executors were by the old law contradistinguished from trustees thus far. It was laid down as a general rule, that where executors joined in a receipt, both having the whole power over the fund, both were chargeable ; where trustees joined, each not having the whole power, and the joining being necessary, only the person receiving the money was by the general rule chargeable. It is impossible to deny, that the rule as to executors has been pared down in a measure by some of the late authorities ; and I will add, in a much greater degree by those authorities than by the precedents to which they refer." "Lord Northington, on Westley *vs.* Clarke, seems to entertain a doubt whether that general rule could be fortified by precedents. I am much mistaken if there are not many. It seems a strong act to dispute the existence of the general rule, when no man can look at the reports of Lord Hardwicke's time

without seeing that he considered that rule as well established as any, distinguishing between acting upon legal and moral necessity." In the case of Lord Shipbrook *vs.* Lord Hinchin-brook, (11 Vesey's Rep., 252) Lord Eldon held the co-trustees chargeable, on the ground of their negligence in joining without due inquiry, in a power of attorney to the other trustee, for the sale of stock, upon his representation that the money was required to pay debts, which was untrue. His Lordship held that an executor, " having a fund standing in the joint names of himself and another, cannot upon the mere representation of the co-executor, if false, be justified in doing an act that is an exercise of power over that fund. First, the act must be necessary for the purposes of the will ; and the person to whom the representation is made, has imposed upon him at least ordinary and reasonable diligence to inquire whether the representation is true."

In the case of Brier *vs.* Stokes, (11 Vesey's Rep., 323) the same learned judge reiterated strongly the doctrine laid down by him in Chambers *vs.* Minchin, maintaining the distinction between trustees and executors, and holding that an executor, as it is not necessary for him to join, interfering in the transaction unnecessarily, he is to be considered as assuming a power over the fund, and therefore answerable for the application ; so far as it is connected with the particular transaction in which he joins.

Lord Redesdale, in Joy *vs.* Campbell, (see note to Sec. 1284, of Story's Eq. Juris., vol. 2,) laid down the following doctrine : " The distinction seems to be this with respect to a mere signing, that, if a receipt be given for the mere purpose of form, then the signing will not charge the person not receiving. But, if it be given under circumstances purporting that the money, though not actually received by both executors, was under the control of both, such a receipt shall charge. And the true question, in all those cases, seems to have been, whether the money was under the control of both executors. If it was so considered by the person paying the money, then the joining in the receipt by the executor, who did not actually receive it, amounted to a direction to pay his co-executor ; for it could

have no other meaning.   He became responsible for the application of the money, just as if he had received it."

In the case of Langford vs. Gascoyne (11 Vesey's Rep., 333) in which the widow placed the funds in the hands of Spurrell, one of the executors, in presence of the other two, Gascoyne and Lambert ; and Spurrell, after counting the money, gave it to Gascoyne, through whose insolvency the fund appears to have been lost, Sir William Grant, M. R., held that Spurrell was responsible, the rule being that, if an executor does any act, by which money gets into the possession of another executor, the former is equally answerable with the other ; not, however, where an executor is merely passive, by not obstructing the other in receiving it.   But if one contributes in any way to enable the other to obtain possession, even with an innocent motive, he is answerable, unless he can assign a sufficient excuse.

Chancellor Kent, in the case of Monell vs. Monell, (5 Johnson's Ch. Rep., 275) fully adopted the doctrine of the two cases last cited ; and the judgment of Justice McClean in Edmunds vs. Crenshaw (14 Peter's Rep., 166) is to the same effect.   (See also Cross vs. Smith, 7 East, 246 ; Sutherland vs. Brush, 7 Johnson's Ch. Rep., 22.)

I have referred to those cases more particularly on account of the announcement of general principles which they contain, and not because I regard them as expressly applicable in the present case.   Here, there is no question arising from a joinder in receipts by Meek with Vincent.   The money in question was drawn from the Custom House by Vincent alone, as appears by the receipts produced by the Collector General.   Meek was not even a party to the petition for the appointment of a receiver, by means of which the funds deposited at the Custom House came to the hands of Vincent.   That petition was signed by Vincent and Wond only.

But it is contended that Meek has made himself responsible by signing. with Vincent the sworn inventory of the property.

In considering this point, it must be remembered that the practice which is said to have formerly prevailed, in the Probate Courts of England, of requiring an inventory to be exhibited before probate, has never prevailed in this Kingdom.

Inventories are not required in our Courts until after probate, and then they are required to be made under oath. They are supposed to contain a full and true exhibit of the entire assets of the testator, whether they may have actually come to the possession of the executor or not. I regard an inventory, under our practice, not as conclusive, but as *prima facie* evidence of the property that has come to the possession, or under the control of the executor. (See Stearn *vs.* Mills, 4 Barn. and Adol., 657.) In the present case, the inventory is signed by two of the executors, and they may be both called upon to discharge themselves of the items of property appearing thereon. It is argued on the part of Meek, that he has complied with this rule, as regards the sum of money in question ,by proving that at the time the inventory was filed, the money had in fact been withdrawn from deposit without his knowledge or consent, and that he signed the inventory on the faith of Vincent's signature. In my opinion they are both bound by the sworn inventory, to this extent : that the money must now be regarded as having been in the Custom House vault at the time the inventory was filed. A less stringent ruling, as touching an item of property like this, would be unjust towards creditors and legatees. As Meek signed the inventory, without inquiring whether or not the money still remained at the Custom House, and relying upon the signature of Vincent, he must abide the consequences. The case is therefore in the same position, so far as Meek is concerned, as if the money had been withdrawn from the Custom House by Vincent immediately after probate of the will. But the fact that he signed the inventory does not, of itself, conclusively bind him to account for that money. The question of his responsibility depends upon other considerations, and requires us to examine the remaining point in the cause.

The testator, by his will, devised all his estate to his daughter Emily, in case she should attain the age of eighteen years, or have issue, subject to a life interest in certain portions of the estate in favor of Hannah Gravier. Pending the minority of the said Emily, all the rents, profits and interest accruing from the estate devised to her, are directed to be applied to her maintenance and education. When the executors obtained probate

of the will, and formally accepted the office of executor, which they all did, they assumed the trust delegated to them, and undertook to perform the duties required of them by law and by the terms of the will. The duties of an executor in this Kingdom are not, as they formerly were (and may be still,) in England, a gratuitous bailment. Under the laws of this Kingdom, an executor does not consent to perform the duties imposed upon him only as a matter of friendship towards the testator and his family, but in part—sometimes altogether—as a matter of business, for the due performance of which he is entitled by law to a reasonable compensation, in the shape of commissions. When one undertakes to perform the duties of executor, he must exercise reasonable care and diligence in carrying out any special trusts devolved upon him by the provisions of the will. If there are several executors, it is the duty of all to see that the estate, or the income arising from it, is applied to the purposes designated by the testator. For negligence in the discharge of this duty, I regard all the executors as responsible. "If one executor knows that the assets received by the other executor are not applied according to the trusts of the will, or in a due course of administration, and he stands by and acquiesces in it, or suffers the assets to be wasted by such executor, without any effort to require or compel a due execution of the trusts, and a due application of the assets in the course of the administration thereof, he will be held liable for any waste or misapplication." (Story's Eq. Juris., Vol. 2, Sec. 1280 a.) In the case of Williams vs. Nixon, 2 Beavau's R., 472, Lord Langdale said : "There can be no doubt that, if an executor knows that the moneys received by his co-executor are not applied according to the trusts of the will, and stands by and acquiesces in it, without doing anything on his part to procure the due execution of the trusts, he will, in respect of that negligence, be himself charged with the loss ; but in cases of this kind it is always to be observed that, the testator himself having invested certain persons with the character of executors, has trusted them to the extent to which the law allows them to act as executors; and in that character, each has a separate right of receiving and of giving discharges for the property of the testator." (2 Story's Eq. Juris., p. 740 ; note 2.)

The doctrine recognized by these authorities is eminently just, and in my opinion, must be held applicable to the present case. The knowledge of the existence of the fund in question, and of the disposition which the executors were required to make of it under the provisions of the will, is clearly brought home to all the executors ; but the fund never was applied or dealt with according to those provisions. Through negligence, or the want of reasonable care and diligence on the part of Messrs. Wond and Meek, a very large part of that fund has been lost in the hands of their co-executor, by reason of his failure in business. For upwards of two years, and until Mr. Vincent became insolvent, Messrs. Wond and Meek allowed their co-executor to retain the possession and use of that large sum of money, without security, or even the payment of interest, and so far as now appears, without any effort whatever to compel its investment, or proper application in a due course of administration. (See Lord Shipbrook *vs.* Lord Hinchinbrook, 11 Vesey's Rep., p. 254). The most superficial inquiry would have shown them, what is quite evident to the Court, that at the time when Mr. Vincent drew the fund from the Custom House, the money was not required for the payment of claims against the estate.

Admitting that at the time the fund in question was taken possession of by Mr. Vincent, he was apparently in thriving circumstances, that cannot be held sufficient to exonerate Messrs. Meek and Wond from responsibility in having suffered their co-executor to retain the money in his hands without proper security. Subjecting the fund to such a risk, was negligence of so high a degree as to render the parties legally responsible for the loss thereby incurred. Had the money been carefully invested, not only would the principal have now been safe, but the payment of the interest, which ought to have been derived from it for the benefit of the infant devisee would have made a regular and comfortable provision for her maintenance.

As I find myself unable to reconcile a less stringent rule of responsibility with a due regard for the interests of legatees and others, especially where they are minors, and with my deliberate view of the duties undertaken by the executors in the present case, and as it seems to me that a contrary doctrine, if

upheld by this Court, would operate as a direct encouragement to negligence on the part of executors, while it would not be supported by authority, I must decline to grant the application of Captain Meek for a discharge, until the fund drawn from the Custom House shall have been accounted for.

Application refused.

C. C. Harris, Esq., for petitioner.

A. B. Bates, Esq., for infant devisee.