CHARLES A. BROWN *v.* JOHN D. SPRECKELS and
ADOLPH B. SPRECKELS, partners under the name of
J. D. SPRECKELS Bros., and A. G. SERRAO, D.
LYCURGUS, S. C. GUERERA, W. C. BORDEN, W.
K. AKANA, WING SING, KWONG WA KEE, C.
AHO, PETER MIGUEL, TANG SING and MRS.
JOHN UTTERSTROM.

CHARLES A. BROWN *v.* J. D. SPRECKELS and
ADOLPH B. SPRECKELS, partners under the name of
J. D. SPRECKELS Bros., and KUM LEONG, SANG
CHUN, MARIA NIAU, AH PING and J. CAMERON.

EXCEPTIONS FROM CIRCUIT COURT, FOURTH CIRCUIT.

SUBMITTED JANUARY 13, 1902.　　DECIDED AUGUST 29, 1902.

FREAR, C.J., PERRY, J., AND L. A. DICKEY, ESQ., OF THE BAR,
IN PLACE OF GALBRAITH, J., DISQUALIFIED.

Parol evidence is inadmissible to vary or contradict the terms of a
deed, as, for instance, to show that the survey notes made one
distance longer than that described in the deed.

Evidence is inadmissible to show the usual meaning of ordinary words,
as, for instance, the broader popular or the narrower legal mean-
ing of the word "beach". The Courts take judicial notice of such
meanings.

The beach between high and low water marks could be granted to
private persons before the annexation of these islands to the
United States.

Even if the law were now different, titles to beach property previously
acquired would remain valid.

Crown lands were alienable by the King in 1853.

Accretion belongs to the littoral proprietor.

A description in a deed, first by monuments, one boundary being
represented as adjoining or coinciding with the edge or the shore

of the sea; then by courses and distances, which apparently do not go quite to high water mark, and finally by a diagram representing the space between the land as described by courses and distances and the sea as "beach", carried title to high water mark at least.

The words "with the right of extension to low water mark" added to a specific description of certain land near the sea, carry the fee to the land in front of the specifically described land, so far as the grantor has the fee.

As a rule land cannot be appurtenant to land.

In construing a deed, the court will, in order to give effect to the intention of the parties, construe a word in a popular or technical or purely arbitrary sense, provided the intended sense can be ascertained in a legal manner. Ordinarily the ordinary meaning will be given to a word, but that it was used in some other sense may be shown by the context, or by proof that it had a different meaning in the particular trade or locality, or, in case of a latent ambiguity, by parol evidence of the special circumstances of the case.

The word "beach" may be used in a legal sense as meaning the space between high and low water marks or in a popular sense as including more or less land according to the circumstances, above high water mark.

When a deed described certain land by courses and distances and then added, "And also the sea beach in front of the same down to low water mark," and the particularly described land extended nearly to high water mark and the land between was of little value and was used in connection with the rest and no reason appeared for not including it or for granting the beach between high and low water marks alone, and possession of the strip between was taken by the grantee without question, it was error to direct a nonsuit on the ground that the word "beach" had a fixed legal meaning covering the space between high and low water marks alone.

### OPINION OF THE COURT BY FREAR, C.J.

These two actions of ejectment were tried together in the Circuit Court and argued together in this Court. They are for accretions on the water front at Hilo, Hawaii. One piece is covered by the second action and two pieces by the first, but only two titles are involved, the two pieces last mentioned being

covered by one title, and the chains of title are in part the same for all three pieces.

Front street runs nearly parallel with and not far from the sea shore at Hilo. Waianuenue and King streets run at right angles to Front street, one block apart, King street being on the Southeasterly or Puna side of Waianuenue street. One title covers the land above Front street between Waianuenue and King streets; the other covers land above Front street, but on the other or Puna side of King street. The question in these actions is whether these titles cover the land, mostly accretion, below Front street, that is, between Front street and the sea, in front of the pieces on the upper side of that street.

The chain of title to the land between Waianuenue and King streets, known as the Bates land, is in part as follows: Deed from King Kamehameha III to Elizabeth G. J. Bates, September 19, 1853; deed from Elizabeth G. J. Bates and Asher B. Bates, her husband, to Benjamin Pitman, July 3, 1858. The chain of title to the other piece, known as the Kalaeloa land, is in part as follows: Land Commission Award 4894, April 18, 1851, to Kalaeloa, followed by Royal Patent 1144, July 7, 1853; deed from Kalaeloa and Hanae, his wife, to Benjamin Pitman, not dated, but acknowledged August 28, and September 18, 1854. The chains of title, thus united, continue as follows: Devise by Benjamin Pitman to Martha B. Pitman, his wife, by will dated March 4, 1880, probated March 27, 1888; deed from Martha B. Pitman to the plaintiff, Charles A. Brown, August 2, 1899.

There seems to be no dispute as to the plaintiff's paper titles. The only question is how much they cover. The defendants offered no evidence, but relied wholly on the weakness of the plaintiff's case, and at the close of the plaintiff's case moved for a nonsuit, which was granted in each case, on the ground that the plaintiff had failed to show that his titles covered the lands in dispute. The plaintiff brings the cases here on three exceptions, two to the refusal to admit offered testimony and

26–D

one to the order of nonsuit. The first two exceptions relate to the Bates land only and will be considered first.

The deed from Kamehameha III to Mrs. Bates describes the portion of the Bates land, or most of it, above Front street by courses and distances and monuments, and then adds the following: "And also the sea beach in front of the same down to low water mark." The defendants contended that the word "beach" has a fixed legal meaning, namely, the shore between high and low water marks, and that there was a strip between high water mark and the part described by metes and bounds which did not pass under the deed. The plaintiff contended that the word "beach" was used in its broader popular sense and that it included the strip just mentioned. At the time of the deed from Kamehameha III the sea ran in much farther than it does at present, the land was of little value, the consideration for the 2.756 acres being only $100, and Front street, perhaps then not known by that or any other name, though it appears to have been known by that name within a year afterwards, was little more than a path or trail. The front line of the portion of the land described by metes and bounds did not coincide with the present upper side of Front street but ran diagonally up from King street to Waianuenue street, striking the latter street about a chain above the present corner of that street and Front street. This is accounted for by the defendants on the theory that the tendency under those early conditions was to go across or cut off corners as much as possible for convenience, and that Front street then slanted up as it approached Waianuenue street and that consequently the description in the deed was made to cover only what was above Front street as it then ran. The plaintiff contended that the description in the deed was intended to extend to the present line of Front street but that by mistake one side, that on Waianuenue street was made too short by one chain, and so he offered to prove that that side was one chain longer in the original survey notes than in the deed. The first exception was to the refusal of the court to permit him to do this.

No error was committed in excluding the survey notes. They were offered merely for the purpose of showing that the length of one side was longer in the survey notes than in the deed, that is, for the purpose of varying or contradicting the deed. Parol evidence is inadmissible for the purpose of varying or contradicting the terms of a deed. The survey notes were not offered for the purpose of explaining a latent ambiguity. We presume they would have been inadmissible even if they had been offered for that purpose, for, although there may be a latent ambiguity in another portion of the deed, there was none in the portion with reference to which the notes were offered. It may be added that there was nothing on the face of the notes to connect them with this deed, and the only testimony relied on was that of a brother of the surveyor, which was very indefinite, and the field notes and deed differ in respect of every course and distance as well as in other important respects.

The second exception was to the refusal of the court to allow the plaintiff to ask a witness, "what is your opinion, as a surveyor, as to what the word beach means in this country?" In view of what we shall say in regard to the next exception and our conclusion thereon, it will not be necessary to say much in regard to this exception. If the intention was to show that the word "beach" is used in this country in the broader popular sense as well as in the narrower legal sense, the testimony was properly excluded, for the reason that evidence is not needed or competent to prove usual meanings of ordinary words. Courts take judicial notice of such meanings. If the intention was to show that the word was used in this country in a peculiar sense different from its ordinary sense, testimony of that general character might perhaps theoretically have been admissible, although in this case there is every reason to believe that the attempt to show that would have been unsuccessful, if it had been allowed, but, even if such testimony were admissible for that purpose, the question asked was perhaps properly disallowed for the reason that there was nothing to indicate that it was, and much to indicate that it was not, offered for that.

purpose, and the question related to the present time only,—
not to the time half a century ago when the deeds were executed.
A word may have acquired a special meaning here recently,
and yet not at that early period in the history of English speak-
ing peoples in these islands.

The third exception was to the order of nonsuit in each case.

This order was based by the trial Judge on the ground that
the King or Government could not under the old regime alien-
ate the shore between high and low water marks, and perhaps
on the ground also that even if the power to alienate did exist
then, the federal law now controls and forbids such alienation.
Counsel for defendants, while presenting this ground of inalien-
ability relied on by the Circuit Judge, rely mostly on other
grounds to support the order of nonsuit.

There can be no doubt that the power formerly existed here
to alienate land between high and low water marks. *King v.
O. R. & L. Co.*, 11 Haw. 717; *Territory v. Liliuokalani*, 14
Haw. 88. There can also be no doubt that if such alienation
was made in these cases, the fact that these islands have since
become annexed to the United States would not affect the
private rights previously granted, even if the law as held by the
federal courts differed from the law that previously obtained in
these islands in this respect. Whether title was granted in these
cases to low water mark or not, we need not say. For it was
not shown, nor was any attempt made to show, that the defend-
ants were in possession between high and low water mark, and
hence no recovery could be had of that strip. Possibly even if
it had been shown that they were in possession of that strip,
ejectment would lie, if the plaintiff owned to high water mark,
even though he did not own to low water mark, considering
his special privileges in the shore in front of his land and the
defendants' want of an exclusive right of occupancy. The order
of nonsuit was clearly erroneous if the plaintiff owned to high-
water mark only. Most of the land sued for and all that was
sought to be recovered at the trial is above high-water mark.

The Bates land, covered by the deed from the King, was

part of the Crown lands. But at that time the Crown lands were alienable by the King. *Estate of Kamehameha IV*, 2 Haw. 715.

If the plaintiff's predecessors in title owned to high water mark, the plaintiff now owns to high water mark although that is now, owing to accretion, much farther out than it was formerly. *Halstead v. Gay*, 7 Haw. 587.

What then do the titles cover? The Kalaeloa piece will be considered first. The description is substantially the same in both the Award and the Patent. It is in Hawaiian and may be translated thus: "Beginning at the West corner of this, adjoining the edge of the street (King Street) along the edge of the sea adjoining the land of Awaawa and stone wall and Hanamaikai, and running." Then follow courses and distances and area. Thus there are two descriptions. One is by monuments, that is, King street on one side, the sea in front, the land of Awaawa and stone wall on the other side and the land of Hanamaikai in the rear. The other description is simply by courses and distances. There is no dispute as to what each of these descriptions means. The two descriptions were evidently meant to correspond or harmonize. The description by monuments would take the land to the sea, that is, at least to high water mark. There is also a diagram on both Award and Patent, representing the land by heavy lines, leaving a space between the front line and the sea, inclosed at the ends with dotted lines, extensions of the two side lines, and with the word "beach" in this space. The names of the other monuments also appear on the diagram in their proper places. If the word "beach" on the diagram was used in its narrower sense as meaning the space between high and low water marks, the meaning contended for by defendants themselves, it is evident that the lower or front boundary as described was intended to be at least down to high water mark. The natural monument along the entire front boundary is given as the edge or shore of the sea. This of course would control courses, distances and area, in the absence of a clearly indicated intention to the contrary. The

description of this boundary is *"ma kapa o ke kai,"* that is, "along the edge of the sea," similar to that of the first side, which is, *"pili ma kapa o ke ala,"* that is, "adjoining the edge of the street." It is true, the boundaries .of the other sides are described as, *"pili ana me"* instead of *"pili ma,"* but we do not see how a distinction material for the purposes of this case can be made in the meaning. The expression is the same for the sea and the street, and the diagram and description both show that the land runs to the street. The fact probably was that the description or survey by courses and distances was for convenience made of the land above what was popularly considered the beach, without any particular reference to where ordinary high water mark was; that the description by monuments showed what was actually intended to be covered, and that the diagram was an attempt to represent both these modes of description at the same time. It seems clear on the whole that the land was intended to go at least to high water mark.

Two other questions are raised in regard to the Kalaeloa land. One is that whatever the Award and Patent passed to Kalaeloa, the deed from.him to.Pitman did not carry the part below the upper side of Front street. The description is first of a portion of the Kalaeloa land by monuments, courses and distances. It begins at the corner of King and Front streets and runs along Front street to a certain point and then up and around to the point of beginning, and then adds, "with the right of extension to low water mark saving and excepting the necessary width of road way." The road way excepted was Front street. It is contended that the grant of the "right of extension to low water mark" was a grant at most of an easement. The word "extension" would seem to imply that the right granted in this clause was of the same kind as that granted in the previous clause, that is, a fee simple. The exception of "the necessary width of roadway" also tends to show that something more than an easement was intended to be granted. There is nothing to indicate that Kalaeloa claimed or supposed he had any particular easement in the lower land. He had the fee, and, having the fee, he

no doubt intended to grant it. The clause should be construed, if possible, as having some meaning, or so as to be given effect. There is no easement that can be assigned to it. It must have meant the fee, as the word "extension" indicates. It is true a better way of drawing the deed might easily be suggested, but that is true of most documents that become subjects of litigation. A clause is not to be rejected merely on the theory that if it was intended to have a particular meaning it might better have been expressed in some other way. The method of expression employed was very likely due to the peculiar method of description in the Award and Patent and the special features of the land. In *Dillingham v. Roberts*, 75 Me. 469, the words "including all the privilege of the shore to low water mark," added to a specific description to high water mark, was held to carry the fee to low water mark.

It is further contended in regard to the Kalaeloa land that the rights of Pitman, if he had any, in the land below Front street under his deed from Kalaeloa, did not pass to the plaintiff, for the reason that they had already passed from Pitman under a previous deed made in 1861 by him to one Thomas Spencer. This deed to Spencer covered several pieces of land, one of which was a portion of the Kalaeloa land other than the portion claimed by the plaintiff. The only words in that deed under which it is contended that the land below Front street passed to Spencer are "with the appurtenances thereof" in the habendum clause. As a rule land cannot be appurtenant to land. This rule may have some exceptions, but even if the present case could be one of them, the evidence was clearly not sufficient to show that the lower land was so used in connection with the portion of the upper land conveyed to Spencer as to require the court to hold as matter of law that it passed as a mere appurtenance of it.

Turning now to the Bates land, the question is one of greater difficulty. In the deed from the King this land is described by courses and distances and, except the front line, by monuments. Then follow these words: "And also the sea beach in front of

the same down to low water mark." The defendants contend that the word "beach" was used here in its narrower legal sense as meaning the area between high and low water marks, and that parol evidence is inadmissible to show that it was used in a broader popular sense as including more or less land above high water mark according to the circumstances. They contend that the intention was to convey two distinct pieces of land, with a strip between remaining in the grantor, there being a strip between high water mark and the front line of the part more specifically described in the deed.

A word may be used in a deed in almost any sense, and if it appears in a proper way that the intention was to use a word in any particular sense, whether a technical sense or a popular sense or a sense in which the word is not used at all by others, the court will give it the intended meaning. It is immaterial whether the parties used it in a wrong sense by mistake or consent. If the intention can be ascertained in a legal manner, it will be given effect. Of course the expressed intention cannot be controlled by proof of a different actual intention. Ordinarily a word is given its ordinary meaning. But if the deed itself shows it to have been used in some other sense, it will be so construed. If the deed does not show that, still it may be shown by poral evidence that the word was used in a particular sense in a particular trade or locality, in which case the court will so construe it, on the presumption that the parties under the circumstances used the word in that sense. And in the absence of any showing of a special sense by the deed or by special custom or usage, parol evidence is admissible to explain the meaning if there is a latent ambiguity.

Now, the word "beach" undoubtedly is used in a broader popular sense as well as in a narrower legal sense. Every one knows this. The former use is probably the more common of the two in ordinary speech. Defendants contend that the word "beach" is synonymous with "shore," and yet in *Mather v. Chapman*, 40 Conn. 382, under a deed of certain land reserving the privilege of piling up sea-manure "on the shore," the

court held that the shore was the upland above high water mark. The defendants had argued in that case, much as the defendants argue here, that the word "shore" had a definite and inflexible meaning in law, denoting the space between high and low water marks, and cited the same authorities to a large extent.

There is nothing to prevent the parties using the word in its more popular sense if they so desire. Naturally the courts construe it in its narrower legal sense. The cases in which such construction is given are mostly cases in which the beach is designated as a boundary. In such cases, of course, as, for instance, when land or a boundary is described as running to or along the beach, the narrower meaning has to be followed generally for certainty. Otherwise it would in many cases be impossible to say where the inner line of the beach was. But when, as in this case, there is a grant of the beach itself in addition to a grant of land above the beach, or, as in the Connecticut case just cited, there is granted or reserved a right to do something on the beach, there is not the same necessity for a strict construction.

In the present case there are indications in the deed itself that the broader meaning was intended. Other land was granted and the beach "in front of the same." This expression, like the word beach, is used in two senses. It might mean anywhere in front, even though there were a strip between, but presumably it means immediately in front, that is, adjoining. In other words, the phrase "in front of" tends to show that the word "beach" was intended to cover all up to the particularly described land. The words "down to low water mark" point in the same direction. They seem to indicate that the word "beach" was not used in a strictly legal sense as necessarily in itself covering just the area between high and low water marks, no more and no less.

The natural construction, looking at the deed alone, would be that the particularly described land extended to high water mark and that the additional clause carried the grant down to low water mark. There is no patent ambiguity. But when an

attempt is made to apply the description to the land, a latent ambiguity appears. There is found a strip between high water mark and the lower particularly described boundary. This, especially in connection with the phrases "in front of the same" and "down to low water mark," gives rise to the question whether the word "beach" was not used in its broader sense. This question arising by evidence *aliunde* may be determined by evidence *aliunde*.

The grantor owned the whole strip and under the same title as the part particularly described. The area between that part and high water mark was not very extensive and was of little value and was closely connected with the upper part in use. There was no apparent reason why the whole should not be conveyed. There was apparently much reason why it should be. It does not seem natural that the space between high and low water mark alone should be conveyed leaving the strip between in the grantor. For what purpose would that space alone be granted? The fact that there was a roadway in front of the upper part may account for the separate description of the two parts. The lower boundary of the upper part, according to the defendants' own contention, was intended to run along the roadway as it was at that time. Then, again, there was testimony tending to show that this broader construction was placed upon the deed by the parties at the time, as shown by their acts. There was testimony, for instance, tending to show that possession was taken and held in accordance with that construction without question. There was more or less testimony as to just where high water mark was at the time of the deed from the King, but it will hardly be necessary to go into that at length now. Apparently at that time there was an earth bank against which the sea washed, which was in places above the present lower side of Front street, and sometimes in very stormy weather the sea washed over it in places.

From what has been said, it is clear not only that the word "beach" might have been used in its broader sense, but that

there is much reason to believe that it was used in that sense, and that the trial Judge erred in directing a nonsuit.

The exception to the order of nonsuit is sustained and a new trial is ordered in each case.

*J. A. Magoon, T. I. Dillon, Holmes & Stanley,* and *Smith & Parsons* for the plaintiff.

*Kinney, Ballou & McClanahan* for the defendants.