CHARLES A. BROWN *v.* JOHN D. SPRECKELS, ADOLPH B. SPRECKELS, AND C. AUGUST SPRECKELS, PARTNERS UNDER THE NAME OF J. D. SPRECKELS BROS., AND A. G. SERRAO, D. LYCURGUS, S. C. GUERERA, W. C. BORDEN, W. K. AKANA, WING SING, KWONG WA KEE, C. AHO, PETER MIGUEL, TANG SING AND MRS. JOHN UTTERSTROM.

ERROR TO CIRCUIT COURT, FIRST CIRCUIT.

ARGUED OCT. 1, 2, 3, 1906.          DECIDED NOV. 15, 1906.

FREAR, C.J., HARTWELL AND WILDER, JJ.

RELEASE—*deed of, valid, though releasee not in possession.*

A deed of release, when made for a consideration, may be construed as a deed of bargain and sale, in order to effectuate the intention of the parties and avoid its invalidity because of the releasee's want of possession.

Even if such a deed would not be valid under such circumstances, at common law, it would be valid here under Hawaiian usage and decisions.

BOUNDARIES—*"beach," "edge of sea," title to low water, under award and patent.*

An award and patent described land by courses and distances which would carry it to the upper side of a street near the shore and parallel with it, and by a natural monument, the "edge of the sea," which would carry it further to at least high water and might have been intended to carry it to low water, and contained a diagram which shows the lot as described by courses and distances and extends in dotted lines the side boundaries to the water and connects them with wavy lines marked "the sea" and marks the space between those lines and the lower course and distance line the "beach," which space also is shown by the evidence to cover land below high water. Held, the title extended to low water.

ID.—*description adding "with the right of extension to low water mark."*

A deed describing the land as above without the diagram but

adding "with the right of extension to low water mark" carries the fee to low water mark.

ID.—"*sea beach,*" *in this case, includes some land above high water mark.*

A deed conveying land described by courses, distances and monuments which would carry it to the upper side of a road running near the shore, "and also the sea beach in front of the same down to low water mark," is held under the circumstances to include the area between the lower course and distance boundary and high water mark as well as the area between high and low water marks.

ACCRETIONS—*how divided between adjoining proprietors.*

The rule that accretion should be divided between adjoining proprietors so as to give them new shore lines proportionate with the old is not of universal application—as, for instance, when there is a deep indentation or, as in this case, a sharp projection.

ERRONEOUS INSTRUCTION—*failure to observe, harmless.*

A verdict should not be set aside because the jury failed to observe an erroneous instruction.

TESTIMONY TAKEN AT FORMER TRIAL—*reading of, held harmless, if erroneous.*

The reading of the testimony given at a former trial of the case by a witness temporarily absent from the Territory at the present trial, is held harmless, if erroneous, because if all the evidence on the point testified to (an alleged break in the alleged adverse possession of the defendants and their predecessors) were stricken out, there would still be no evidence that there was adverse possession during the period testified to and the burden was on the defendants to show that. Moreover this was not a case for "tacking."

ADVERSE POSSESSION—*degree of proof.*

An instruction that the jury should find against the defendants on the issue of adverse possession unless they "were satisfied by a preponderance of the evidence that the defendants have *clearly* proven adverse possession," etc., is not erroneous.

LOST DEED—*may or should be presumed, when.*

When for a long period a plaintiff in ejectment and his predecessors have made no claim of title and the defendants and their predecessors have been in possession under claim of title, the court may, according to the circumstances, instruct the jury that they may or should presume a deed to the defendants' predecessor in order to quiet their possession and solve the difficulties, and in so doing the jury may consider what may have occurred as well

as what may fairly be supposed to have actually occurred. In this case the question was left to the jury, and the evidence was such as to permit, if not require, them to find against the theory of a lost deed.

OUSTER—*little evidence required to prove, as to part of land, when.*

When the land sued for includes parts above and below high water claimed under one title and treated largely as a whole and the defendants are shown to be in possession to high water at least, little evidence is required to show that they are also in possession of the part below high water. There was sufficient evidence to show this in this case.

COMMENT ON EVIDENCE—*not ground for new trial, even if prejudicial, when consented to by counsel.*

It is not sufficient ground for a new trial that the trial judge in overruling a motion for a directed verdict in the absence of the jury made, by way of explaining his decision, remarks which showed that he leaned strongly towards the plaintiff's side in his view of the evidence and that such remarks were published in the newspapers and read by the jurors before the case was submitted to them and were referred to and read by them after their retirement, although they had been instructed not to be influenced by them—the defendants, movants for the new trial, having consented previously that the jurors might read the newspapers and asked the judge not to order them not to read them and stated that they, the defendants, were willing to take their chances.

CONDUCT OF JURY—*error in admitting affidavits as to, held harmless.*

The erroneous admission, in opposition to a motion for a new trial, of affidavits of jurors, to the effect that they would have heeded the admonition of the court, if given, not to read certain newspapers, to their reading of which counsel consented, and that they were uninfluenced by the publication therein of certain remarks of the court, was harmless, for the reason that they did not affect the decision of the court on the motion and the decision was right irrespective of the affidavits.

OPINION OF THE COURT BY FREAR, C.J.

This is an action of ejectment for two pieces of land, referred to as the Bates and Kalaeloa lands, on the waterfront at Hilo. It was begun in the fourth circuit in 1899. At the first trial the jury disagreed. At the second a nonsuit was ordered which was set aside by this court (14 Haw. 399). At the third trial,

in the third circuit, to which the venue was changed, the jury disagreed. At the fourth trial, in the first circuit, to which the venue was changed, the jury disagreed. It was then held that the venue had not been changed from the fourth circuit on the theory that the order for the change was void owing to disqualification of the judge, but this court held otherwise and directed by writ of mandamus the court in the first circuit to try the case (16 Haw. 476). Then after a long and careful trial the plaintiff obtained a verdict which the defendants now seek to have set aside on writ of error.

The facts are set forth somewhat fully in 14 Haw. 399. Briefly, Front street runs nearly parallel with and not far from the shore. Waianuenue and King streets run at right angles to Front street one block apart. The Bates land is between these two streets, and the Kalaeloa land on the other side of King street. Both lands extend down at least to the upper side of Front street, and, according to the plaintiff, down on the other side of Front street to low water mark. The plaintiff does not dispute the defendants' title to the parts above the street. The action is for the parts below the street, all or mostly accretions.

The defendants contend, first, that the plaintiff has failed to show title in himself to all or part of the land because (1) there was not a sufficient conveyance to him, (2) the description in the Kalaeloa land commission award and patent did not cover any land below Front street, or at least below high water mark, (3) the description in the original deed of the Bates land from the king did not cover any land below Front street excepting between high and low water marks, and (4) the plaintiff is not entitled to all the accretion in front of the Bates land under the rule of apportionment of accretion between adjoining proprietors; secondly, that the defendants, the Spreckels brothers, showed title in themselves by (5) adverse possession and (6) a presumed lost grant; thirdly, that (7) the plaintiff failed to prove ouster or possession by the defendants as to the part below high water mark; and, lastly, that the ver-

dict should be set aside because of (8) misconduct of the jury. These questions are raised by seventeen assignments of error based on the contentions that the verdict is contrary to the law and the evidence, that the trial judge erred in admitting certain evidence, in giving and refusing various instructions, in denying motions for a nonsuit, a directed verdict, judgment non obstante and a new trial, and in admitting certain affidavits on the question of the misconduct of the jury.

1. The first contention (mainly under assignments of error 1, 2, 6 and 10), is that the plaintiff did not have title to any part of the land in dispute for the reason that the deed under which he claims is merely a deed of release and therefore void because made to him when out of possession and without an interest in the land.

The Kalaeloa land was confirmed to Kalaeloa in 1851 by L. C. A. 4894, R. P. 1144, and by him conveyed to Benjamin Pitman in 1854. The Bates land was conveyed by Kamehameha III to Elizabeth G. J. Bates in 1853 and by her to Benjamin Pitman in 1858. The parts of both lands above Front street were next conveyed by Pitman to Thomas Spencer in 1861. Pitman then left these islands not to return and died in Boston in 1888 leaving the parts below Front street, in so far as title to them was in him. to his wife as part of the residue of his estate devised to her. In 1899 she, not in possession, made the deed in question to the plaintiff, who also was not in possession. The operative words of the deed are "remise, release and forever quitclaim unto said Charles A. Brown and his heirs and assigns forever, all and singular my right, title and interest in and to the land and premises," etc. This form is used twice in the deed, and the habendum refers to "the above released lands, premises and property." The words "give, sell, assign, transfer and set over" are used in the instrument, but only with reference to back rents, issues and profits.

The contention is that a release at common law to one out of possession is void and that, under Rev. Laws, Sec. 1, the com-

mon law must be followed here except as modified by Hawaiian statute, usage or ·judicial precedent. A distinction is drawn between a release proper ·and the so-called modern quitclaim deed, at least if the latter contains words of grant in addition to or without the usual operative words of a release.

Deeds often bear a dual character and may be construed as belonging to one class or another according to the circumstances in order to effectuate the intention of the parties. On this theory it is well settled that a deed of release when made for a consideration (in this case the consideration was $5000) should be treated as a primary deed of bargain and sale in order to avoid its invalidity, as a secondary or derivative deed of release, because of the releasee's·want of possession. 13 Cyc. 525; Tiedeman, Real Property, Sec. 782; and cases there cited.

Aside from this, a deed of release, though to one out of possession, is effectual in these islands because supported by usage,—which also is in harmony with judicial decisions as far as they have gone; for the foundations of the rule against releases to one out of possession,—such as the necessity for livery of seisin unless the grantee is already in possession, and the early law against champerty, maintenance and assignment of choses in action—have been held not to obtain here. *Mossman v. Government,* 10 Haw. 421, 436, in which a conveyance by a disseisee was held valid. The general line of reasoning applied in *Henrique v. Paris,* 10 Haw. 413, is largely applicable to this case; and in this as in that case, it may be stated that the usage, although it may not have been the subject of actual judicial decision, has been recognized by the court to some extent. For instance, in *Ninia v. Wilder,* 12 Haw. 104, 118, the court said: "This rule of the common law, however, rendering void a conveyance by a disseisee to a stranger is not in force here," and, referring to a case elsewhere, "in that case, the release was to one of the parties in possession having title. But it matters not here, whether the release be to a party in possession or a stranger."

2. It is contended (assignments of error 5, 6, 8 and 12) that the Kalaeloa land did not extend below the upper side of Front street and therefore did not include any of the land now in dispute, which is all below that line, or, at least, that it did not extend below high water mark. Under the former decision, (14 Haw. at p. 406), the deeds of the land from the patentee to Pitman and from the latter's residuary devisee to the plaintiff carried the fee to low water mark, under the words "with the right of extension to low water mark," provided the patentee had title to low water mark. The question is whether the patentee had such title under his award and patent. It was held in the former decision (p. 405) that the award and patent carried the title at least to high water mark under the description by monuments, which was held to control the description by courses and distances. If the title extended no further we presume that ejectment would not lie to protect the plaintiff's special privilege on the shore in front of his land, and that he would have to rely for such protection upon some other remedy, such as trespass on the case or injunction, although he might retain his verdict by remitting all below high water mark; but in our opinion the title extended to low water mark.

The description of the lower boundary of the land in the patent is "ma kapa o ke kai," that is, "along the edge or side of the sea." This is ambiguous. It might mean along high water mark or along low water mark. Presumptively it means along high water mark. But the description in the award and patent by courses and distances brings the land down only to the upper side of Front street, which was above high water mark; the description by the natural monument, the edge of the sea, brings it, as held in the former decision, at least to high water mark, that is, below the upper side of Front street; the diagram in the award and patent shows the boundary according to courses and distances and then extends in dotted lines the two side boundaries to the water and connects their ends with curved irregular lines marked "ke kai," the sea, and the entire

space between the sea and the lower course and distance boundary is marked "beach." Therefore, as shown by the natural monument, at least part of the space marked "beach," that is, to high water mark, was intended to be covered by the patent, and, as shown by the diagram, if any of this space was intended, all of it must have been. But "beach" means primarily the space between high and low water marks. In this instance, as intimated in the former decision, the word was apparently used in its broader, popular sense as including more or less above high water mark, but it would naturally and presumptively include the shore at least, that is, the space between high and low water marks, and in this case there is nothing to indicate that it was not intended to include that,—and apparently it was understood to include that, as shown by the descriptions in the subsequent deeds, "with the right of extension to low water mark." The evidence also tends to show that part of the space marked "beach" was then below high water mark. The peculiar method of description in the patent is easily accounted for by the fact that Front street, then a mere unimproved roadway, ran across the land just below the portion described by courses and distances, and that below that there was for the most part only a sandy stretch. There is no rule of law that would prevent the title from extending to low water mark. Former decision, supra, at p. 404. There are other awards and patents that cover land below high water mark and, as we shall see, the title to the neighboring land now in dispute covered the shore.

3. The contention (assignments of error 4, 6 and 11) in regard to the Bates land is the reverse of that in regard to the Kalaeloa land. It is that the original deed from the king to Bates covered, besides the land above Front street, only the beach strictly speaking, that is, between high and low water marks, which would be a shifting strip moving out and in with accretions and attritions, and that the accretions all belong to the owner of the land immediately above high water mark, which, it is contended, was not conveyed.

The deed from the king conveyed the land down to what was then the upper side of Front street by courses, distances and also by monuments except on the sea side, "and also the sea beach in front of the same down to low water mark." Below Front street, as it was then, but along a line that is now in Front street, there was a bank which was then the line of ordinary high tide. The high water mark is now, owing to accretions, some distance out from where the bank was formerly. The action is for all the land, mostly accretions, below Front street, that is, below a line that is now below the old line of the bank and high water.

The jury were instructed that the deed from the king conveyed all the Bates land sued for, and also that the plaintiff had made out a complete paper title to that. It is contended that under the former decision the question whether "sea beach" was intended in the deed from the king in its narrow technical sense as meaning only the area between high and low water marks or in its broader, popular sense as including more or less land above high water mark, in this case say to the upper side of Front street or lower boundary of the part described by metes and bounds, should have been left to the jury and that the court erred in taking the question from the jury. The court later in its charge instructed the jury fully and clearly in accordance with the defendants' view upon this point, leaving the question to the jury, and perhaps this instruction, in view of its explicit and particular character, should be regarded as preventing any harm that might otherwise have resulted from the short, general inconsistent instructions just referred to, but we will assume otherwise; for, as we view the evidence, the jury could not properly have found differently if they had understood that the question was open to them.

It is clear, from the reasoning of the former decision (pp. 407-411), much of which might well be set forth more positively and forcibly now than was required for the purposes of that decision, that the words "sea beach" as used in the deed from the king presumptively mean all the land both above and

below high water mark in front of the part described by courses. and distances—although those words would, but for the peculiar circumstances of this case, presumptively mean only the land below high water mark. The function of evidence aliunde would be to overcome this presumption, but the evidence adduced instead of overcoming the presumtion greatly strengthens it. There is, indeed, no evidence entitled to consideration the other way. It was shown (see particularly the testimony of Judge Lyman and Mrs. Ailau, the daughter of Benjamin Pitman, who were thoroughly familiar with the subject at and before as well as after the execution of the deed from the king in 1853) that the area from low water mark to an indefinite distance above the bank or high water mark, at least as far up as the upper side of Front street, was used by the general public for beach purposes, such as hauling canoes on to it, drying fish nets, landing merchandise, piling drift wood, strolling, picknicking, etc., and was commonly known as "beach" or "sea beach," and perhaps also "sand beach," although the last phrase may have been, for greater particularity, more often applied to the part below the bank. In exceptionally high tide the water washed above the bank and according to some of the testimony at times to the upper side of Front street, up to which, and perhaps further, there was more or less sand at that time. The diagram in the Kalaeloa award and patent above referred to shows that the word "beach" was used at that time in that locality as including more or less land above high water mark. The only testimony pointed out as tending in the other direction consists of two brief passages, one from the testimony of Mrs. Ailau and one from that of James Keliihelcua. That of Mrs. Ailau was on her cross examination by the defendants, she being a witness for the plaintiff. Even taking this isolated passage by itself it can hardly be construed as tending to show that the witness meant to confine the expression "sea beach" to the land below high water mark, but taking her entire testimony on cross examination alone, and much more so on both direct and cross examination, it is beyond dispute that she

meant that the beach was understood to include all up to the upper side of Front street, if not further, and that in the short passage relied on by the defendants she was perhaps in part speaking of the sand beach alone as distinguished from the beach or sea beach and in part using the words in a general way with her thoughts directed to other points just as counsel themselves for the defendants have frequently done in this case. The testimony of the other witness relied on is to the effect that when he was told to go down to the beach and play he would be pointed to the place below high water mark—which would naturally be the place where he would be expected to play, that is, where the water was—and that when asked if he had ever heard foreigners in Hilo speak of the land above the bank as sea beach he replied no. The fact that that witness did not recollect having heard foreigners speak of the land above the bank as sea beach could not be allowed to overcome the presumptions from the language of the deed itself and the definite, positive testimony of other witnesses to the effect that that was commonly known as "beach" or "sea beach,"—irrespective of any allowances that might properly be made from the weight to be given to the testimony of this witness in view of his mental and physical debilities and the fact that he understood very little English at the time in question. That at most would be but a scintilla of evidence.

4. It is contended (assignments of error 14 and 17) that the verdict is against the law and the evidence as to at least a portion of the accretions in front of the Bates land on the theory that that portion belongs to the owner of adjoining land under the rule of apportionment of accretions between adjoining proprietors.

The general contour of the shore on Hilo bay, on which the Bates land fronts, is a slight concave curve. At the north end of the Bates land there is a sharp projection or tongue of rock extending at right angles to the shore several hundred feet into the bay and tapering or narrowing towards its outer end, at which there is a small wharf. Along this projection Waia-

nuenne street extends to the wharf after crossing Front street.
As accretions formed in front of the Bates land, they naturally
extended out along the south side of this rock projection and
naturally extended out further along the projection than they
did at the other end of the Bates land, the new shore line making
a curve outward toward the projection.

The defendants argue that the projection is government land
(the plaintiff contending that the government has only an ease-
ment for street purposes) ; that, as the jury was instructed, the
plaintiff must recover on the strength of his own title; and that
the rule of apportionment is correctly stated in the following
instruction of the court, which also, they contend, was binding
upon the jury whether correct or not:

"If you find that any of the property sought to be recovered
in this case consists of accretions to land to which the plaintiff
has shown title, then the plaintiff is entitled to his portion or
share of said accretions according to the following rule. The
new shore line should be divided into parts proportionate to
the frontage of the riparian proprietors on the ancient shore
line and division lines should then be drawn from the old divi-
sion points to the new."

This point is not to be favored. The defendants do not pre-
tend to be entitled to the portion of the accretion now claimed
to belong to the rock projection, and, of course, seek to have
the verdict set aside on this ground merely on the weakness of
the plaintiff's case and for the purpose of having it set aside
as to the rest of the land. Perhaps the verdict if erroneous in
this respect could be sustained upon the filing of a remittitur
of the portion of the accretions now in question, but, however
that may be, we think it can stand for the entire accretions.

So far as the instruction of the court is concerned it was
erroneous. In the first place, without being hypercritical—in
view of the position taken by the defendants,—it relates solely
to accretions to land to which the plaintiff has shown title, and
which, therefore, ipso facto, belong to the plaintiff, and of
course he cannot be required to share his own property with
others. In the second place, the rule itself, although perhaps

the correct one to be applied in general and under ordinary circumstances, does not apply to the present case. The correct and more general rule is that the division of accretions should be equitable with a view to giving each proprietor a fair portion of the accretions and access to the water, in view of the contour and location of the respective lands before the accretions were formed. For instance, the general line of the shore would ordinarily be taken and the relative lengths of frontage upon it irrespective of deep indentations and sharp projections. *Deerfield v. Ames,* 17 Pick. 41; *Fountain v. Grant,* 10 R. I. 477. In the present case there is a sharp projection and it is not clear who owns it or, if there is one owner of the whole of it, how much more of the shore line on the other side of the projection that owner has. The plaintiff may own it. He, moreover, according to the defendants, owns to low water in front of the Bates land, however far out that may be pushed by the accretions; and the accretions, in the sense used by the defendants, were always formed above low water, that is, on, not merely in front of, land that belonged to the plaintiff. There was no beach along the projection. High and low water marks were the same along that. The Bates land and not the projection would have been the loser if there had been attrition instead of accretion. If the rule stated by the court were applied, it would give the projection a broadening instead of a narrowing shape seaward and tend to cut off the access of the Bates land to the bay. A verdict should not be set aside because, perhaps through inadvertence or misunderstanding, the jury failed to observe an erroneous instruction, however much it was their duty to endeavor to observe it. There were not sufficient data before the jury to enable them to make a proper division of the accretion, if any division ought to be made. There was enough to justify them in finding that the accretion all belonged to the land in front of which it was formed.

5. In connection with the defendants' claim of title by adverse possession two errors are alleged. The first (assignment of error 3) is that the court erred in allowing the testi-

mony of Geo. W. Macfarlane taken at a previous trial of the case to be read in evidence against objection. The defendants claim that they and their predecessors have held adversely since 1861, when Spencer acquired title. Spencer held, so far as he held at all, until 1880, or a little short of the twenty years then required by the statute of limitations, when he was succeeded by Macfarlane, who held for four years and then conveyed to the defendants, the Spreckels brothers. The paper title, how-ever, throughout extended down only to Front street, and the object of Macfarlane's testimony was to establish a break in the adverse possession, if there was any adverse possession, of the part below that street, by showing that he, Macfarlane, did not claim title to that part or take possession of it.

Macfarlane had left the Territory for California six or eight months before the trial and had not yet returned, although apparently he had been expected to return before the trial. No motion had been made for a continuance until his return, nor had any attempt been made to obtain his deposition. The trial judge, in admitting the testimony, stated in substance that he did so on the theory that it was a matter within his discretion and that the circumstances, including the indefiniteness as to the time when the case was to be tried, justified this.

It is unnecessary to say whether the testimony was properly admitted or not. See 2 Wigmore, Ev., Sec. 1404. Nor need we say whether the error, if there was error in admitting it, was harmless, because, as it is contended, substantially the same tes-timony was given by another witness, Mr. Reinhart, who, as Macfarlane's agent, was in charge of his Hilo property during the four years in question.

The burden of making out a case of adverse possession was on the defendants. They could accomplish that only by con-necting their adverse possession with that of others who had held adversely before them, for their own possession had been far short of the requisite period when this action was begun. If all the testimony tending to show that Macfarlane had not held or claimed adversely were stricken out, there would still

be no evidence that he had so held, at least none has been called to our attention. The jury, moreover, were instructed, and no error is assigned as to this, that the doctrine of "tacking," which was explained, had no application to this case because there was no evidence of any transfer from Spencer to Macfarlane or from Macfarlane to the defendants of any right that Spencer may have acquired in the lands in dispute. Nor would the admission of Macfarlane's testimony affect adversely to the defendants the question, which perhaps was raised in the lower court, whether Spencer had acquired title to the lands in dispute below Front street, by continuing to hold them adversely after he had parted with the title to those above that street, and so whether the title was not out of the plaintiff even if it was not in the defendants.

It is urged, secondly, (assignment of error 7), in connection with the claim of adverse possession that the court erred in instructing the jury that unless they were "satisfied by a preponderance of the evidence that the defendants have clearly proven adverse possession," etc., they should find against the defendants on that point. Objection is made to the insertion of the word "clearly." We find no error in this. *Davis v. Howard,* 172 Ill. 340, 344; *Roby v. Calumet, etc. Co.,* 211, Ill. 173, 180; *Huntington v. Whaley,* 29 Conn. 391, 398; *Illinois Steel Co. v. Budzisz,* 115 Wis. 68, 84; *Baldwin v. Shannon,* 43 N. J. L. 596, 603; *Ward v. Cochran,* 154 U. S. 597, 606.

6. The defendants contend also (assignments of error 13, 14 and 16) that they are entitled to possession upon the presumption of a lost grant. They make this claim on the law as held in *Fletcher v. Fuller,* 120 U. S. 534, to the effect that, when for a long period of time there has been an absence of any claim of title on the part of the plaintiff and his predecessors and possession on the part of the defendants and their predecessors under claim of title, and no deed to the defendants' predecessors can be found, the jury may find that the defendants' predecessors had acquired title on the presumption that there was a conveyance which has been lost, and that in

making such presumption the jury may consider not merely what may fairly be supposed to have actually occurred but what may have occurred and may be requisite to quiet title in the defendants and solve the difficulties arising from the non-execution of the deed; and that the circumstances may be sufficiently strong to justify an instruction that it is their duty to presume such a conveyance and thus quiet the possession.   It is contended that a lost deed from Pitman to Spencer should have been presumed from the undisputed facts which, it is contended, are as follows:  In 1860, Pitman. when owning the property above Front street and the beach below and having a store above and using the beach for trading purposes when whale ships came in, advertised an offer to sell his entire business at Hilo, with or without the real estate or any part of it, and later advertised that he had disposed of his business interests at Hilo to Thomas Spencer, and on January 1, 1861, executed two deeds to him, one covering leasehold interests and the other the lots in question down as far as Front street without mentioning the beach,—no bill of sale of the contents of the store being found, although presumably there was one; Spencer took possession of the store and premises and continued to make the same use of the beach as Pitman; a few months later Pitman left these islands not to return and spent the rest of his life in Boston, where he died in 1888 leaving a will in which he made no mention of this beach property, but, on the contrary, in a bequest to his sons, expressed regret that he had "so little to bequeath them;" his widow was residuary legatee and devisee; neither Pitman nor his heirs ever made any claim to the property below Front street after 1860,—the first claim being made by the plaintiff after he had purchased Mrs. Pitman's rights in 1899; Pitman had other real estate on Oahu, Maui and Hawaii, not connected with his business, which he left in charge of attorneys-in-fact who returned them for taxation and gradually sold them off, but who did not return for taxation or otherwise deal with the property in dispute.   It is contended that no single act of Pitman or Spencer is inconsistent with the theory that Pitman sold the land to Spencer.

The Court left the question of the presumption of a lost deed to the jury, instructing them as requested by the defendants in accordance with the law as laid down in *Fletcher v. Fuller,* and the defendants have no fault to find in this respect. But they now go further and contend that it was the duty of the jury on the evidence to have presumed a lost deed, and that the evidence was such that as matter of law the court should have directed a verdict, although so far as the record shows that was not requested on this ground, and should have granted the defendants' motion for judgment non obstante veredicto, although it does not appear upon what grounds that was asked, and that the verdict should now be set aside as contrary to the law and the evidence.

In our opinion the evidence was such as to permit, if not require, the jury to find against the theory of a lost grant. The facts in this case are not nearly so strong in support of that theory as the facts were in *Fletcher v. Fuller,* and yet even in that case the court did not say that it was the duty of the jury to presume a lost grant. In that case the time was very much longer—more than a century; there was a complete chain of conveyances of the land during that period under which the defendant claimed, and references in other early deeds tending to indicate that the title was out of the plaintiff's predecessor and in the defendant's predecessor in title; and the evidence tending to show exclusive possession under claim of ownership on the part of the defendant and his predecessors was very much stronger.

In the present case the plaintiff's contention, which is in large part at least sustained by the facts as shown by undisputed evidence or as might have been found by the jury, is somewhat as follows: The entire period in question is only thirty-eight years; this is not the case of an absence of direct proof of a deed of the land in question from Pitman to Spencer in 1861 but the case of a proved deed which omits the land in question below Front street although it includes the land above Front street, in connection with which that below the street is claimed.

to have been used, and both of which were covered by the earlier deeds to Pitman and his predecessor Bates; similarly Spencer, when he mortgaged the land above Front street to McGrew, did not include the land below that street now in dispute, and the same is true of the conveyance to Macfarlane on foreclosure of that mortgage and the conveyance by Macfarlane to the defendants, the Spreckels brothers; if a lost conveyance is to be presumed from Pitman to Spencer it is equally necessary to presume a lost mortgage from Spencer to McGrew, a lost deed on foreclosure to Macfarlane and a lost deed from the latter to the Spreckels brothers, which would be absurd; Spencer, moreover, did not use the land below Front street except in the same way in which the general public used it, namely, for beach purposes; and when he found himself in financial difficulties he made a lease of all his lands to his son for fifty years, with the privilege of renewal for fifty years, at a small rental, and yet did not include the land in question; when he became bankrupt his trustees in bankruptcy did not claim the land; when he petitioned for discharge from bankruptcy he made oath that he had turned over all his property to the trustees; his successor, Macfarlane, who bought the land above Front street in 1884, did not take possession and made no claim to the land below the street; so of the Spreckels brothers, who bought in 1884, until 1885, when they built a fence along the lower side of the street on this land and in 1889 began to erect buildings or lease portions of the land upon which their tenants erected buildings; until 1889 it was a sort of "nobody's land," as one of the defendants' witnesses, who had been their agent with respect to this land, had said.

7. It is contended (assignment of error 9) that there was no evidence of ouster as to the land between high and low water marks. If that were so, that part could be remitted so as to allow the verdict to stand as to the remainder of the land, but in our opinion there was sufficient evidence to go to the jury on this point. It would seem to be of little or no consequence to either side whether the part between high and low water marks

is included in the verdict in this case or not in so far as its inclusion or exclusion depends on this point. The defendants were clearly shown to have been in possession to at least high water mark and indeed admitted that. Each tract sued for, comprising land both above and below high water mark, was treated as a whole through much of the case. Very little evidence would be required to show that the defendants were in possession below high water mark. It was shown by one of the defendants' witnesses that he, the witness, acting as the defendants' agent, built a fence along the lower side of Front street in 1885, thus shutting off from the street all the land below, both above and below high water, and that after buildings began to be erected on this land in 1889 he collected rents on behalf of the defendants for "the property below Front street, the property in dispute below Front street," which of course included what was below as well as what was above high water mark. No distinction was made between these parts by the witness. The defendants' predecessor Spencer also, according to this witness, claimed the land on which the wall was erected by the road authorities in 1874, six or eight feet below the bank, to protect the street from the wash of the sea, which apparently was between high and low water marks.

8. The second of the two grounds of the motion for a new trial (assignment of error 17) is that the trial judge stated in overruling the plaintiff's motion for a directed verdict that he was in favor of the plaintiff but did not want to grant the motion as there was still some doubt in his mind and that if the jury should render a verdict for the defendants and a motion to set aside the verdict should be made he might do so; and that this statement of the judge, although made in the absence of the jury, was published in two newspapers of general circulation in Honolulu and read by several of the jurors before the submission of the case to the jury and read aloud in the jury room by one of the jurors during the deliberations of the jury. This point is argued under the head of misconduct of the jury although in view of the facts it would perhaps more appropriately come under some other head.

The facts are substantially as follows, as shown by the affidavits filed in support of and against the motion for a new trial and the statement of the trial judge in overruling the motion. At the close of the evidence after a trial that lasted several weeks the plaintiff moved for a directed verdict and the jury was excused during the argument of that motion and the settlement of the instructions immediately afterwards. After some argument in support of the motion the judge stopped the argument and, as he says, in order to explain why he stopped the movant and at the same time decided against him, made the statement now in question under the impression that there was no one present who would be likely to report it. Upon the return of the jury one of the defendants' counsel addressed the jury and when within a few minutes of the expiration of his allotted time asked for an adjournment with the privilege of occupying the remainder of his time the following morning. Shortly before, the bailiff had called the attention of the judge to the following article in that day's Evening Bulletin:

"FAVORS PLAINTIFF IN CASE OF BROWN-SPRECKELS.

"The long-drawn suit of Brown vs. Spreckels, wherein the plaintiff sues for the possession of a valuable piece of land on the Hilo waterfront, will finally go to the jury today, the indications being decidedly in the favor of the plaintiff. This was shown by a statement made by Judge De Bolt when he gave his ruling on a motion for a directed verdict in favor of the plaintiff.

"Judge De Bolt said that he was inclined in favor of the plaintiff, but did not want to grant the motion for a directed verdict, as there was still some doubt in his mind. He might say, however, that should the jury render a verdict for the defendant and should a motion to set aside that verdict be made, he might do so."

Immediately upon counsel's taking his seat the judge proceeded to admonish the jurors as he usually did upon their separation and further to instruct them not to read the papers of that evening or of the next morning, but to lay them aside and read them later, but had proceeded no further when the

same counsel arose and said in substance: "Your Honor I presume refers to the article in the Evening Bulletin. We do not ask for such an order. Let the jurors read the papers, we will take our chances." Whereupon the judge withdrew that part of the instruction to the jury and, as he states, understood that throughout the remainder of the proceedings the jurors were at liberty, with the consent of the defendants, to read those papers. Counsel at the same time made some remark which was understood to mean that he charged opposing counsel with having procured the publication in question. Opposing counsel resented this and when the court convened the next morning asked for an investigation in order to remove from their side of the case the cloud of suspicion which they stated they were under by reason of the remark. The judge discouraged raising a side issue and said that counsel were trying to make a mountain out of a mole hill, but as both parties pressed the matter he proceeded with the investigation, which, however, did not go far before it appeared that the plaintiff and his counsel were wholly blameless in the matter and counsel for the defendants apologized for his remark and opposing counsel accepted the apology and likewise apologized for what had been said on their side. Meanwhile the morning paper, the Advertiser, had been published containing an article entitled, "Long trial now ending. Judge De Bolt leans to plaintiff—Kinney's argument," and containing, among other things, the statement that the judge's denial of the plaintiff's motion for a new trial was "thus reported by an evening paper," quoting the last paragraph of the article above set forth, and continuing:

"As such motions are argued and decided in the absence of the jury, an Advertiser reporter asked Judge De Bolt after adjournment if he desired to say anything on the matter.

"In reply he stated that he did make such an intimation of his view of the case to the attorneys. He did it entirely to save their time in arguing on the motion, but was not aware that any member of the press was present when he made the remarks."

The judge, at the conclusion of the apologies, at once instructed the jury as follows:

"And I will now say to the jurors, and I will instruct them at greater length upon that point, to disregard the whole affair. Gentlemen of the jury, they say difficulties will arise in the best regulated families.

"Gentlemen of the jury, regarding the statements in the evening papers, at least one of them, rehashed in the morning paper, I suppose counsel refer to both, purporting to express or contain supposed views of the Judge of this Court, the way that came about was something like this: Counsel for plaintiff presented a motion, as you are all aware, asking the court to direct a verdict for the plaintiff. You were then excused and counsel for plaintiff proceeded to argue that motion, argued it at some length, perhaps consuming a half an hour or such matter; whereupon I stopped counsel in his argument, making some observations explanatory of my reasons for stopping him and giving him the conclusion that I had reached.

"Whatever remarks were made by the court; whatever intimations or opinions that the court might have expressed or entertained at that time, were made without having heard counsel for the defendant and were not intended to influence the jury. In fact they were only intended for the purpose of explaining the position of the court in stopping the argument at the time it did.

"I think that makes it clear and I will instruct the jury perhaps at greater length and from a little different standpoint at the close of the argument."

Argument to the jury was then resumed. In his charge to the jury the judge instructed them upon this point at length and with great care pointed out their position as judges of the facts, their duties under their oath and directed them to disregard whatever views he had expressed and not to be influenced in any way by the views expressed by him or by what had taken place between counsel. In fact, as all agree, every effort was made by court and counsel on both sides to have the jury disregard the whole matter. In the jury room, however, the matter was mentioned and, upon some of the jurors stating that they had read the publication in the newspapers and others that they had not, one of the jurors produced a paper—accord-

ing to the affiant's recollection the Advertiser—and read the report of the judge's remarks aloud.

The defendants contend that the statement of the judge was in effect a comment upon the evidence such as is prohibited by the statute (Rev. Laws, Sec. 1798; *Lyman v. Hilo Tribune,* 13 Haw. 453); that it went even further and was in the nature of a threat to set aside the verdict if it should be rendered for the defendants; that the article in the Advertiser was far more dangerous than that in the Bulletin inasmuch as it contained an interview with the judge which would remove all doubt as to the correctness of the report; that if there was a waiver it was only of what the Bulletin article contained, as that alone had been published when counsel consented to the jurors reading the papers, or that at most the waiver did not go beyond what might reasonably be expected to be published in the morning paper and that it was beyond the bounds of reasonable expectation that the morning paper should contain the interview with the judge admitting the correctness of the report, in addition to the report itself, and that the waiver, if any, did not extend to the reading of the publication in the jury room when the jury were together as a unit performing their sworn duty of deliberating upon the evidence and in spite of the admonitions of the judge.

The judge, in overruling the motion for a new trial, referred to the length and expense of the trial and to the fact that as he viewed it the verdict was a just one and suggested also that under the common law practice, retained under the federal constitution (*Capital Traction Co. v. Hof.,* 174 U. S. 1; *Territory v. Schilling,* 17 Haw. 249, 264; *In Re Nolley Will,* 15 Haw. 701), which now governs in these islands, his remarks might properly have been given to the jury directly, at least when coupled with his instructions that they were not binding upon the jury, notwithstanding the statute against commenting upon the evidence. The judge, however, based his opinion mainly upon the ground of waiver. He referred to the fact that, up to the time of counsel's consent that the jurors might

read the papers, they had not read them and that from the admonition of the judge not to read the papers of that evening or the next morning they could not have inferred that there was or would be anything in them prejudicial to either side or, if they could infer that, they could not infer to which side it was favorable or prejudicial, and stated that the jurors were intelligent, conscientious citizens and that he had no doubt in his own mind that they would have obeyed his admonition not to read the papers. He stated also that, besides having the jurors admonished, several other avenues were open to counsel, such as going on with the case and finishing it that day without giving the jurors an opportunity to see the papers, or not allowing the jury to separate if the case was continued until the next morning (Act 75, Laws of 1905), or possibly, in case neither of these courses was pursued, he might have moved for a mistrial the next morning.

In view of these facts and the findings and decision of the trial judge we cannot say that he erred in overruling the motion for a new trial. Counsel for the defendants, upon having their attention called to the first publication did not do what they could, or assist the court, towards preventing the matter from coming to the attention of the jury but actually frustrated the attempt of the court to accomplish that result and expressly stated that the jurors might read the papers—the morning as well as the evening paper—and that they were willing to take their chances. Their position might have been different if they had done or acquiesced in the doing of what might have been done in that direction and if the attempt had failed. The most plausible ground that they can take now is that the Advertiser article was more dangerous than the other and was read in the jury room notwithstanding the instructions of the court, and that some of the jurors had not up to that time read that article or perhaps the Bulletin article. They, however, did not raise any objections in regard to the Advertiser article after they, and presumably the jurors, or many of them, had read it, or to the remarks of the judge and counsel

in regard to it before the case was submitted to the jury. Indeed, it would probably have been easy to have prevented the morning paper from referring to the matter at all; at any rate, apparently no attempt was made to do so. We cannot say that the Advertiser article was materially more prejudicial than the Bulletin article, especially as the contents of the Bulletin article were not of such a nature as to suggest that the report was incorrect and the remarks of the judge and counsel that afternoon were such as to assume the correctness of the report; but if the Advertiser article was more prejudicial the defendants cannot claim now that they did not waive its reading by the jury. They expressly consented to that in advance and were willing to take their chances, as they said. Moreover, that article is claimed to have been more prejudicial solely because of the judge's acknowledgment of its correctness, but the judge practically did the same directly to the jury when, referring expressly to the morning paper as well as the evening paper, he explained the matter to the jury in the passage above quoted immediately after the exchange of apologies by counsel and no objection was taken to those remarks. It seems to have been taken for granted that all the jurors knew the tenor of the publication before the case was submitted to them and, if it was not, it might as well have been in view of all that had taken place in their presence. It may have been that some of the jurors had not read the Advertiser article and perhaps not even the Bulletin article, but they must all have known their gist. There was no direction nor was there any request to the effect that the articles, or either of them, should not be read or their contents stated or referred to by the jurors after their retirement. They were directed in substance merely not to allow the remarks of the court as published to have any influence upon them in arriving at a verdict. Nothing would be more natural, after all that had occurred, than for some reference to be made to the publications in the jury room. The reading of one of the articles there was no worse than would have been a statement by one of the jurors as to its contents. This might

naturally have been done or the publications have been referred to in various ways as a result of questions prompted by curiosity or for passing the time during lengthy deliberations or for other harmless reasons. It does not appear nor is there any reason to believe that the jurors disregarded the instructions of the judge not to permit the publications to weigh with them or that they were influenced by anything that took place in regard to the publications in the jury room. The case might have been different if they had been ignorant of the whole matter when they retired. The harm, if any, that was done was done already before they retired. It sometimes happens that matters occurring are so prejudicial in their very nature that their harmful effects cannot be cured by an instruction of the judge to disregard them. If that were the case here, it would still be true that the prejudicial matters were consented to and waived by the defendants so that they cannot complain even if the harm was not cured. Mere reference in the jury room to matters which the jurors already knew would not show that they disregarded the instruction of the court to endeavor not to be influenced by them. Some of the jurors had read both publications and all must have known their substance, no objections had been made to references to them in the presence of the jury that morning and they had in the most open and unqualified manner been given leave to read both papers and no attempt was made at any time by counsel for the defendants to prevent further knowledge of the publications or their contents on the part of any of the jurors whose knowledge might have been incomplete up to the time of the submission of the case to them. It cannot be said that any harm was done for which the defendants' counsel were not to blame or in which they did not acquiesce or in regard to which they had not stated unequivocally that they were willing to take their chances.

It is contended further (assignment of error 15), that the trial court erred in admitting the affidavits of each of the twelve jurors to the effect that they would have heeded the request of the judge not to read his published remarks had not

the defendants' counsel said that he had no objection to their reading them, that they understood from the remarks, both of counsel for the plaintiff and the judge, that they were not to consider them or be influenced by them in any way; and that they rendered their verdict impartially and upon the merits without any regard to the remarks. These affidavits should not have been admitted. If the trial judge had based his decision upon them the result at most would be not the reversal of the verdict and the ordering of a new trial, but the reversal of the decision on the motion for a new trial and a remand of the case to the judge for passing again upon that motion. But apparently the decision was uninfluenced by these affidavits and would have been precisely the same if they had been rejected and in our opinion that decision was right.

The judgment of the circuit court is affirmed.

*J. A. Magoon* and *J. Lightfoot* for the plaintiff.

*W. A. Kinney* and *S. M. Ballou* (*Kinney, McClanahan & Derby* and *Ballou & Marx* on the brief) for defendants.