*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

Electronically Filed
Supreme Court
SCWC-30475
08-OCT-2015
08:51 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

KA'UPULEHU LAND LLC, a Hawai'i limited liability company,
Petitioner/Plaintiff-Appellee,

vs.

HEIRS AND ASSIGNS OF PAHUKULA (k); et al.,
Respondents/Defendants-Appellants.

_____

SCWC-30475

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(ICA NO. 30475; CIV. NO. 08-1-0023K)

OCTOBER 8, 2015

RECKTENWALD, C.J., NAKAYAMA, MCKENNA, AND POLLACK JJ., AND
CIRCUIT JUDGE PERKINS, IN PLACE OF ACOBA, J., RECUSED

OPINION OF THE COURT BY McKENNA, J.

I.    Introduction

This case involves a title dispute between

Petitioner/Plaintiff-Appellee Ka'upulehu Land LLC ("KLL") and

Respondents/Defendants-Appellants Heirs and Assigns of Pahukula,

et al. (collectively "Defendants"), stemming from KLL's

"Complaint to Quiet Title" to the following property:

> All of that certain parcel of land (being all of the land(s) described in and covered by Royal Patent Number 6667, Land Commission Award Number 8723, Apana 1 to Kahoiwai) situate, lying and being at Mahukona, District of Kohala, Island and County of Hawaii, State of Hawaii, bearing Tax Key designation (3) 5-7-002:004, and containing an area of approximately 11.746 acres, more or less.

("Property").[1]

Despite having obtained the Property through paper title derived from a common grantor, KLL claims that it and Defendants' title to the Property is defective because the common grantor had actually sold the Property prior to his death. KLL claims that neither it nor Defendants received valid title to the Property. KLL claims that it is therefore entitled to one-hundred percent (100%) of the Property through adverse possession. In the alternative, KLL claims that if title to the Property descended to the common grantor's heirs, it is a cotenant with Defendants.

Defendants, on the other hand, argue that they and KLL are cotenants because they both received their interests in the Property through a series of conveyances stemming from the common grantor.

We hold that the evidence presented by KLL was not sufficient to establish that the common grantor was not vested with title to the Property when he died. Therefore, title to

---

[1] The acreage differs slightly from the description in the "Certificate of Title" prepared by Title Guaranty of Hawaii, Inc. ("Title Guarantee Certificate"), which described the Property as containing "11.300 acres, more or less."

2

the Property descended in accordance with the law in effect at the time of the common grantor's death to his heirs. We further hold that Defendants and KLL are cotenants, having received interests in the Property through mesne conveyances stemming from the common grantor. Accordingly, the Intermediate Court of Appeals ("ICA") erred in finding that there was a genuine issue of material fact with respect to the existence of a cotenancy.

We therefore vacate the ICA's January 9, 2014 Judgment on Appeal and the circuit court's March 25, 2010 Final Judgment, and remand this case to the circuit court for a determination of interests in title to the Property.

## II. Background

### A. Facts

Land Commission Award No. 8723 and Royal Patent No. 6667 were issued for the Property to Kahoiwai in 1851 and 1875 respectively. In 1885, Kahoiwai deeded the Property to his son, Kaehuokekai, also known as David Hukai Kahoiwai ("David"). David died intestate on December 13, 1903. His estate was probated on August 24, 1904, where the court determined that David had four heirs: two sisters, Kenoiaina and Miliama;[2] a brother, Pahukula; and Pua, a minor niece. Under the intestacy laws in effect at the time of David's death, each heir would

_____

[2] Miliama was also known as Miriama.

3

have received a 1/4 interest in David's estate as Revised Laws of Hawaiʻi (RLH) § 2106 (1898) provided that "[i]f [the intestate] shall leave no issue, nor father, nor mother, his estate shall descend one-half to his widow, and the other half to his brothers and sisters, and to the children of any deceased brother or sister by right of representation." As explained in further detail in Part II below, the administrator of David's estate testified in the probate court that the Property had "upon information been sold during [David's] lifetime[,]" so the Inventory he prepared reflected that David had no real property subject to distribution through probate. No conveyance document, however, was ever adduced. Therefore, David's heirs did not receive any interests in the Property through the probate proceeding.

While probate was pending, however, three of David's four heirs proceeded to convey interests in the Property. A chart of these conveyances is reflected in the attached Addendum. As can be seen, through a series of conveyances, KLL obtained an interest in the Property through one of David's heirs, Miliama. Miliama conveyed "all of [her] interest" in David's estate to her son, Samuel ("Sam") Keanu, in 1906. Sam conveyed "all [of his] right and title and interest" in the Property to Joseph

4

Iseke in 1914.[3]  Joseph Iseke conveyed "[a]ll of his undivided interest, representing not less than a 1/3 undivided interest" in the Property to Richard Smart by warranty exchange deed in 1961.[4]

In 1988, despite allegedly receiving only a 1/3 interest himself, Richard Smart purported to convey the entire Property to the Richard Smart Revocable Personal Trust by quitclaim deed. In 2002, the Richard Smart Revocable Personal Trust conveyed a number of properties including a purported 100% interest in the Property by land trust deed to the Parker Land Trust.[5]  In 2004, the Parker Land Trust conveyed four properties purportedly including the entire Property by quitclaim deed to KLL.

According to the Title Guarantee Certificate issued to KLL in 2007, Miliama's interest in the Property "descends straight and unbroken to" KLL from August 3, 1961, the date of the Joseph

---

[3]     Sam's interest in the Property was conveyed to a "Joseph Isaacs." No conveyance of record appears under the name Joseph Isaacs; however, a deed dated August 3, 1961 conveys a 1/3 interest in the Property from Joseph "Iseke" to Richard Smart.

[4]     It is unclear how Joseph Iseke was able to convey a 1/3 interest if he received his interest through a series of mesne conveyances from Miliama, who would have received only a 1/4 interest in the Property through intestacy.

[5]     There is a mark indicating that the Property was recorded in the "Land Court System"; however, the Bureau of Conveyances stamp appears in the "Regular System" portion of the deed.  The deed that conveys the Property from Parker Land Trust to KLL was recorded in the "Regular System."  Neither KLL nor Defendants assert that the Property is Land Court property.

Iseke to Richard Smart deed, to June 15, 2004, the date KLL received its interest in the Property.[6]

David's heir Pahukula died intestate without conveying an interest in the Property and without a probate proceeding of his estate or a judicial determination of his heirs. The record, however, includes a deed from Pahukula to his son, Henry C. Hapai, that was recorded with the Registrar of Conveyances in September 1910. In this deed, Pahukula conveyed his "undivided interest in the estate of [his] father/uncle Kahoiwai[,]" which included a property on Maui specifically described in the deed. Pahukula conveyed only his interest in the Maui property, and not any interest in the Property. Therefore, the status of Pahukula's interest, if any, remains unclear.

The remaining half of the Property descended to William P. McDougall ("McDougall"). Kenoiaina deeded "all" of her "right, title, interest and estate . . . in and to" the Property to McDougall in 1907. In 1908, David's heir Pua deeded her "right to [her] share of" the property to H.L. Holstein, the attorney of record for David's heirs throughout the probate proceeding, who conveyed "all" of his "right, title, interest and estate in and to" the Property to McDougall in 1909.

---

[6] Notably, the maximum liability of the Title Guarantee Certificate is limited to one thousand dollars ($1,000).

McDougall died intestate in 1935. McDougall's probate proceeding inventory did not contain any real estate holdings. No judicial determination was made of McDougall's heirs; however, according to the Title Guarantee Certificate, Bureau of Health Statistics records reveal that McDougall had a son, Albert McDougall, who died at the age of 37 in 1923, twelve years before the elder McDougall's death. The record further reveals that Albert had a wife, Mary McDougall, who died in 1935, leaving four minor children: Walter, Hazzerd, Nani, and George McDougall. The Defendants in this case are McDougall's great-grandchildren, who had not heard about the Property, but who may have an interest in the Property through McDougall.

**B.   Circuit Court Proceedings**

On January 25, 2008, KLL commenced its quiet title action. KLL claimed title to the Property on alternative grounds. First, KLL claimed title to 100% of the Property through adverse possession. In the alternative, KLL claimed a cotenancy with Defendants as record owner pursuant to the 2004 quitclaim deed from Parker Land Trust.

**1.   KLL's Motion for Default Judgment and/or Summary Judgment**

On December 3, 2009, KLL filed a motion for default and/or summary judgment. KLL argued that it had title to 100% of the Property by adverse possession due to an alleged "break in the

chain of title that gives rise to claims of paper title by both [KLL] and [Defendants]." KLL contended that David sold the Property prior to his death, and thus, neither party could claim paper title through David's heirs.

KLL admitted that there was no record of any conveyance made by or under the name of Kaehuokekai or his alias David Hukai Kahoiwai; however, KLL asserted that David's probate records constitute prima facie evidence that David sold the Property before he died. The probate records KLL noted include the Inventory of David's estate, filed on February 14, 1905, in which E.A. Fraser, a creditor and the administrator of David's estate stated under oath that "certain kuleana #8723 in the name of Kahoiwai situate at Pulehu near Mahukona and which belonged to deceased had upon information been sold during lifetime of said Kahoiwai." The Inventory further provided that the only property remaining in David's possession at the time of his death was 10 shares in 'Ewa Plantation, stating "None" for real estate held by David.

In addition, KLL noted other records in the probate proceeding that allegedly support its position, including (1) clerk's minutes entered on February 2, 1906 wherein the clerk wrote, "Sam Keanu [] makes an appearance as a claimant to real

8

estate which he claims Kahoiwai owned and sold[;]"[7] (2) Schedule A of the Final Accounts filed on September 13, 1905, which states that the estate's only asset was "$314.50" derived from the sale of the 'Ewa Plantation Stock; (3) a master audit report filed on August 30, 1917 (i.e., twelve years after the opening of probate), which confirms the Final Accounts as "correct[;]" and (4) a power of attorney signed by all four heirs in which the heirs "accept as correct" the clerk's accounting of the assets and liabilities of the estate.

In further support of its adverse possession claim, KLL argued that it and its predecessors in interest (1) continuously used the Property for ranching operations since 1961; (2) controlled access onto the Property by posting "no trespassing" signs; (3) maintained fences, walls, gates, and chains; and (4) excluded trespassers from the area.

In support of these assertions, KLL submitted a number of declarations from individuals familiar with ranching operations conducted on the Property. Declarations were submitted for Melvin B. Hewitt ("Hewitt"), a retired trustee of the Richard Smart Revocable Personal Trust and the Land Trust Agreement for

---

[7] It is unclear why Sam Keanu made this statement as he was making an appearance as a claimant to the Property he obtained from Miliama, one of David's heirs. In addition, the clerk's minutes from February 5, 1906 note that a certified copy of the deed from Miliama to Sam Keanu was filed in the probate proceeding.

9

the Parker Ranch Foundation Trust, Masa Kawamoto ("Kawamoto"), a rancher and resident of the area since 1922 who had been employed by Parker Ranch as a foreman from 1937-1967, Harry M. Von Holt ("Holt") and Herbert M. Richards, Jr. ("Richards"), ranchers and residents of the area since 1948 and 1955, respectively, and John Metzler ("Metzler"), a managing member of KLL.

Hewitt, Holt, and Richards stated that Richard Smart had purchased the Property in 1961 and used it continuously for ranching operations by Parker Ranch. Hewitt, Kawamoto, Holt, and Richards stated that Parker Ranch (1) cleaned and maintained the Property; (2) controlled access by posting no trespassing signs, maintaining fences, walls, gates and chains, and excluding trespassers from the Property; (3) did not allow anyone to enter or remain on the Property without Parker Ranch's consent; and (4) used it continuously for ranching operations since 1961, such as pasturage, breeding, and running cattle.[8] They also stated that members of the community, including neighboring property owners, acknowledged and recognized that Parker Ranch owned and operated the Property until it was sold to KLL in 2004.

---

[8] Kawamoto also stated that he had been personally involved with and supervised fence building, cattle operations, and various other ranching activities on the Property.

10

Finally, Metzler stated that since KLL purchased the Property in 2004, together with other surrounding properties, KLL continued the ranching operations conducted by the Property's previous owner, Parker Ranch. Metzler stated that, similar to Parker Ranch, KLL had controlled access to the Property and that members of the community, including neighboring property owners, acknowledge and recognize that KLL owns the Property.

As an alternative to its adverse possession claim, KLL argued that, if the circuit court found that the Property had not been sold before David died, then KLL and Defendants were cotenants with each having paper title to 1/2 of the Property.

### b. Defendants' Arguments

Defendants filed a memorandum in opposition to KLL's motion for default and/or summary judgment, denying that David sold the Property. First, Defendants noted that no mention was made of the person to whom the Property was purportedly sold, and asserted that no other evidence of the alleged conveyance existed. Defendants contended that the probate statements regarding a sale were made in error as evidenced by the conveyances by three of David's four heirs in 1906, 1907, and 1908, while probate was still pending (probate closed in 1917). Defendants argued, therefore, that the Property descended to David's heirs, Kenoiaina, Miliama, Pahukula, and Pua, through

11

intestacy. Defendants maintained that KLL and Defendants therefore obtained title from David's heirs and were thus cotenants.

Second, Defendants argued that KLL's predecessor was plainly on notice of the cotenancy because (1) the 1961 deed from Joseph Iseke to Richard Smart purported to convey only a 1/3 interest in the Property, and (2) multiple deeds recorded in the Registrar of Conveyances in 1908 (from Kenoiaina and Pua) and 1909 (from H.L. Holstein) show that David's other heirs conveyed the Property to McDougall. Defendants further argued that KLL failed to prove that it acted in good faith to the cotenants during the purported period of adverse possession.

Finally, Defendants asserted that whether any parties inherited the Property from David based on the probate records was an issue of fact required to be resolved at trial; therefore, KLL's motion should be denied.

### c. KLL's Reply

KLL argued in reply that Defendants failed to set forth specific facts as to whether David had title to the Property when he died in order to demonstrate a genuine issue of material fact for trial. KLL argued that it presented undisputed evidence that conclusively proved that David sold the Property. KLL asserted that neither KLL nor Defendants had title to the Property because title was vested in someone else when David

12

died.  KLL therefore argued that no cotenancy existed and that, therefore, the requirement of good faith notice to cotenants was inapplicable to KLL's claim of title by adverse possession.

### 2.  The Circuit Court Ruling

On December 21, 2009, the circuit court held a hearing on KLL's motion for default and/or summary judgment.[9]  KLL argued that there was direct testimony from the administrator of David's estate, and the entire probate record itself was devoid of any reference to the Property; therefore, cotenancy was not an issue because David had transferred his interest in the Property before he died.  KLL asserted that the only issue was whether it had met its burden for adverse possession.

Defendants countered that the deed from the alleged transaction never surfaced, nor was the person who took that conveyance ever identified.

The circuit court then asked Defendants what other evidence would be presented to the court at trial, and stated:

> If there's no genuine material issue of fact, these are the
> facts, there's not more facts and there's not live
> witnesses where the Court is placed in a position of
> evaluating credibility, it is just – these are the facts
> and we disagree as to what the legal results should be or
> are there facts that the Court needs to weigh?

---

[9]     The Honorable Elizabeth A. Strance presided.

13

Defendants responded that they were not aware of any additional facts, but they would have the opportunity to further investigate if the case were to proceed to trial.

On February 4, 2010, the circuit court filed an order granting KLL's motion for default and/or summary judgment, concluding that (1) there were no genuine issues of material fact with respect to title to the Property, and (2) KLL was entitled to judgment as a matter of law to 100% of the Property by adverse possession free of all claims and encumbrances.

On March 24, 2010, the circuit court entered its final judgment, which Defendants appealed to the ICA.

C.    ICA Appeal

1.    Defendants' Opening Brief

In their Opening Brief, Defendants argued that the circuit court erred as a matter of law in granting summary judgment in KLL's favor as to exclusive ownership of the Property.  Defendants contended that the only conclusion supported by KLL's evidence is that it holds paper title jointly with Defendants.  Defendants further argued that KLL cannot set up title in an unknown stranger to defeat the cotenancy between itself and Defendants in order to avoid its burden of notice to cotenants.  Defendants asserted that, at most, the circuit court could have found that there were competing claims to paper title to defeat summary judgment to the extent that KLL presented

14

sufficient evidence to raise a genuine issue of material fact that David sold the Property before he died, or alternatively, that KLL holds title jointly with Defendants.

### 2. KLL's Answering Brief

KLL argued that the circuit court correctly granted summary judgment in its favor because Defendants could not support their claim of paper title to the Property and failed to raise a genuine issue of material fact. KLL contended that it provided sufficient evidence in the form of David's probate records to show that David was not vested with title to the Property at the time of his death. KLL argued that because it derives title by adverse possession and established that David was not vested with title when he died, it could not be cotenants with Defendants.

KLL further argued that the circuit court correctly ruled that it had established title to 100% of the Property by adverse possession where it established all the necessary elements of title by adverse possession.

### 3. Defendants' Reply Brief

In reply, Defendants maintained that KLL's adverse possession claim attempts to set up title in a stranger to defeat Defendants' claim, and cannot stand without the court first determining that someone else held title to the Property before David died. Defendants argued that the circuit court, in

15

ruling that KLL had title to 100% of the Property by adverse possession, erroneously ruled by implication that an unknown stranger held paper title to the Property against whom KLL was adversely possessing.

### 4.  The ICA Memorandum Opinion

The ICA ruled that, according to the record, David's heirs received no interest in the Property through the probate proceeding.  Kaʻupulehu Land LLC v. Heirs and Assigns of Pahukula, No. 30475, at 2-3 (App. Dec. 11, 2013) (mem.).  The ICA cited the following in support:  (1) the February 6, 1905 Inventory stating that David owned no real estate at death and containing an averment by the estate's administrator confirming that to his knowledge, the Property had been sold during David's lifetime; (2) the February 2, 1906 clerk's minutes regarding Sam Keanu's "appearance as a claimant to real estate which he claims [David] owned and sold."; and (3) the August 22, 1906 power of attorney executed by David's heirs acknowledging a clerk's accounting of the probate expenses and residue of the estate as accurate.  Kaʻupulehu, mem. op. at 3.  The ICA also noted, however, that there was no record of David's "purported pre-death conveyance of the Property[.]"  Id.

The ICA concluded that Defendants "provided evidence showing interests in the Property through a chain of paper title that is not perfect.  But in the case at hand, the break in the

16

chain of record title carries an added significance:  the break places the existence of a cotenancy between [KLL] and the Defendants in dispute."  Ka'upulehu, mem. op. at 6-7.

The ICA stated:  "If there were no gaps in the chain of record title, the parties would be cotenants because the paper interests of all parties originate with the series of conveyances made by David's heirs."  Ka'upulehu, mem. op. at 7. The ICA reasoned that the break in record title occurred between David and his heirs because "David's probate records suggest the Property was sold before he died, and that no interest in the Property was distributed to David's heirs through probate."  Id. The ICA concluded, however, that "there is no recorded conveyance by David to any third party, and three of David's four heirs conveyed an interest in the Property after David's death and before probate closed."  Id.  The ICA thus concluded: "The issue then is where there is a shared break in the parties' chains of record title, does [KLL] prevail on summary judgment by claiming superior title to the Defendants through adverse possession?"  Id.

The ICA explained that where a cotenancy exists, there is a requirement of good faith between cotenants that requires the tenant claiming adversely to actually notify the cotenants of his or her claim against them, and that a "finding of bad faith may be inferred from evidence that the cotenant in possession

17

should have known that a cotenancy existed." Ka'upulehu, mem. op. at 8 (citing Wailuku Agribusiness Co. v. Ah Sam, 114 Hawai'i 24, 34, 155 P.3d 1125, 1135 (2007), as amended (Apr. 12, 2007)). The ICA further stated, "Breaks in chains of record title provide reason to suspect the existence of one or more cotenancies." Id. (citing Petra v. Allencastre, 91 Hawai'i 545, 985 P.2d 1112 (App. 1999)).

The ICA held that in concluding that a cotenancy did not exist, the circuit court erroneously resolved the disputed issue of material fact, the existence of a cotenancy, in favor of KLL. The ICA concluded:

> [T]he lack of a recording from David's purported pre-death conveyance, together with the recorded conveyances of interests in the Property by David's heirs, are genuine issues of material fact regarding the existence of a cotenancy. The existence of a cotenancy is a material fact that [KLL] must overcome to satisfy its proof of title through adverse possession.

Id. The ICA further concluded that the conveyances to Sam Keanu and H.L. Holstein were particularly notable from an evidentiary standpoint because (1) Sam testified during David's probate proceedings that the Property had been sold, and (2) H.L. Holstein, the heirs' probate attorney of record, received an interest in the Property from one of David's heirs. Thus, "[w]hile Keanu and Holstein had knowledge of the probate proceedings that did not distribute any interest in the Property to David's heirs, both took interests in the Property from

18

David's heirs and subsequently conveyed those interests."
Kaʻupulehu, mem. op. at 9. The ICA concluded that "[a]ny
inferences from this evidence must favor the Defendants, the
non-moving party." Id.

The ICA then cited to its decision in Makila Land Co. v.
Kapu, 114 Hawaiʻi 56, 156 P.3d 482 (App. 2006), which states the
following regarding genuine issues of material fact arising from
conflicting interpretations of undisputed facts, as in the
instant case, that preclude summary judgment:

> A judge ruling on a motion for summary judgment cannot
> summarily try the facts; his role is limited to applying
> the law to the facts that have been established by the
> litigants' papers. Therefore, a party moving for summary
> judgment is not entitled to a judgment merely because the
> facts he offers appear more plausible than those tendered
> in opposition or because it appears that the adversary is
> unlikely to prevail at trial. . . . Therefore, if the
> evidence presented on the motion is subject to conflicting
> interpretations, or reasonable men might differ as to its
> significance, summary judgment is improper.

Id. (citing 114 Hawaiʻi at 67-68, 156 P.3d at 493 (citing Kajiya
v. Dep't of Water Supply, 2 Haw. App. 221, 224, 629 P.2d 635,
638-39 (App. 1981))). The ICA held that it could not conclude
that KLL "has a right to judgment with such clarity as to leave
no room for controversy, nor ha[d] [KLL] established
affirmatively that Defendants cannot prevail under any
circumstances." Id. The ICA therefore vacated the circuit
court's final judgment granting KLL's motion for default and/or
summary judgment, and remanded the case to the circuit court.
Kaʻupulehu, mem. op. at 9-10.

19

## III. Standard of Review

This court has stated:

> A motion for summary judgment is reviewed de novo, under the same standard applied by the trial court. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting an essential element of a cause of action asserted by one of the parties.
>
> On a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. The court is permitted to draw only those inferences of which the evidence is reasonably susceptible and it may not resort to speculation.
>
> The burden lies upon the moving party to show that no genuine issue of material fact exists with respect to the essential elements of the claim and that, based on the undisputed facts, he is entitled to judgment as a matter of law. Only once the moving party has satisfied its initial burden of production does the burden shift to the non-moving party to show specific facts that present a genuine issue for trial.
>
> When a summary judgment motion is filed before the discovery deadline, a [Hawaiʻi Rules of Civil Procedure (HRCP)] Rule 56(f) continuance provides the means by which a non-moving party can assure that she has had adequate time to conduct discovery before the motion is decided.

Winfrey v. GGP Ala Moana LLC, 130 Hawaiʻi 262, 270-71, 308 P.3d 891, 899-900 (2013) (internal citations, brackets, and quotation marks omitted).

## IV. Discussion

### A. Title to the Subject Property Vested in David's Heirs Upon His Death

This case turns on whether David was vested with title to the subject property when he died. If he was, then KLL and Defendants are cotenants, and as explained below, KLL would not be able to meet legal requirements to establish adverse

20

possession with respect to its cotenants.  If he was not vested with title, then KLL and Defendants are not cotenants, and the circuit court properly concluded that KLL is entitled to a 100% interest in the Property based on adverse possession.

In this regard, the parties dispute whether David sold the Property prior to his death and the sufficiency of KLL's evidence to prove the sale.  KLL argues that it is entitled to 100% of the Property by adverse possession because David was not vested with title to the Property at death and thus, the parties are not cotenants.  KLL asserts that it "provided ample, uncontroverted evidence from David's probate proceedings establishing that he had sold . . . the Property prior to his death."  For example, the order of distribution of David's estate admitted into evidence contains no mention of the Property.  KLL therefore argues that the ICA gravely erred and was obviously inconsistent in finding genuine issues of material fact regarding the existence of a cotenancy, and asserts that the ICA's conclusion that David's heirs received no interest in the Property through the probate proceeding disposes of Defendants' claims.

Defendants contend that the omission of the Property in the probate distribution is not a conclusive or binding determination of David's non-ownership of the Property; thus,

21

title to the Property cannot fail to pass to David's heirs by virtue of a probate order.[10]

---

[10] As a preliminary matter, although not argued by the parties, we note the effect of two legal precepts relevant to the issues. First, the statute of frauds in effect at the time provided, in relevant part:

> No action shall be brought and maintained in any of the following cases:
>
> . . . .
>
> Fourthly: Upon any contract for the sale of lands, tenements or hereditaments, or of any interest in or concerning them;
>
> . . . .
>
> Unless the promise, contract or agreement, upon which such actions shall be brought, or some memorandum or note thereof, shall be in writing, and be signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized.

RLH § 1314 (1898); RLH § 1996 (1905) (recodification).

Defendants raised the statute of frauds in their Answer, but did not provide any further argument. As this affirmative defense was pled, it was not waived. Lee v. Kimura, 2 Haw. App. 538, 545, 634 P.2d 1043, 1048 (1981) ("The defense of the statute [of frauds] . . . may undoubtedly be waived by the defendant, and unless he sets up the statute and relies on it by some proper pleading, he thereby impliedly waives the objection that the contract was not in writing." (internal quotation marks and citations omitted)). See also HRCP Rule 8(c) (2000) (affirmative defenses). Because we rule in Defendants' favor on other grounds, we do not rely on the statute of frauds. We note, however, that the alleged conveyance from David would be void and unenforceable under the statute of frauds as no written memorandum signed by David evincing the alleged sale of the Property has been produced.

Second, pursuant to RLH § 2380 (1905),

> All deeds . . . or other conveyances of real estate within this Territory, shall be recorded in the office of the registrar of conveyances, and every such conveyance not so recorded shall be void as against any subsequent purchaser, in good faith and for a valuable consideration, not having actual notice of such conveyance, of the same real estate, or any portion thereof, whose conveyance shall be first duly recorded.

The record is devoid of evidence of a deed from David's alleged pre-death sale of the Property. Therefore, if David had sold the Property, the buyer's failure to record the deed would have rendered it void as against subsequent purchasers without actual notice of the purported sale, i.e., at

(continued. . . )

22

The only direct evidence in support of KLL's allegation is the administrator's testimony under oath in the February 14, 1905 Inventory "[t]hat a certain kuleana #8723 in the name of Kahoiwai situate at Pulehu near Mahukona and which belonged to deceased had upon information been sold during lifetime of said Kahoiwai[,]" and a February 2, 1906 entry in the clerk's minutes that reads: "Sam Keanu makes an appearance as a claimant to real estate which he claims Kahoiwai owned and sold." Neither of these, however, conclusively establishes a sale as KLL contends.

First, the administrator's statement was based on "his knowledge and belief[,]" and provides no information to support the statement. Second, Sam Keanu purchased an interest in the Property from his mother Miliama for $50 in exchange for "all of [Miliama's] interest in [David's] estate . . . , being all the real and personal property at Kohala[.]" Both of these statements are being "offered in evidence to prove the truth of the matter asserted[,]" i.e., that David sold the Property, and thus constitute hearsay. Hawaiʻi Rules of Evidence (HRE) Rule 801 (1993). Nonetheless, the statements may be admissible as a hearsay exception under either HRE Rule 803(b)(15) (1993), which

( . . .continued)
minimum, McDougall and Joseph Iseke, subsequent purchasers not involved in the probate proceeding. Again, Defendants do not rely on this theory, and we decide this case in their favor on other grounds.

23

provides for the admissibility of "[s]tatements in documents affecting an interest in property," or Rule 803(b)(16), which provides for the admissibility of "[s]tatements in a document in existence twenty years or more the authenticity of which is established." The admission of these statements, however, is not determinative.

As noted by the ICA, there were multiple conveyances of the Property during the probate proceeding by individuals who would have known if David had not been vested with title. Three of David's heirs conveyed interests in the Property during probate.[11] Notably, the record also reflects that Sam Keanu and H.L. Holstein, the heirs' attorney of record, accepted conveyances of the Property[12] that were inconsistent with the statements made in the probate proceedings by the administrator and Sam Keanu himself.

In addition to relying on these hearsay statements, KLL notes that the probate record is devoid of any reference to the Property being part of David's estate. Multiple documents, including the February 14, 1905 Inventory and the September 13, 1905 Final Accounts, state that the only asset remaining in

---

[11]    As discussed supra, there is no record of conveyance of the disputed Property by David's brother Pahukula, who was listed as an heir at David's probate proceedings.

[12]    Pua was a minor at the time of David's probate proceedings in 1905. Although the record does not state how old she was, H.L. Holstein, her attorney on record, received an interest from Pua in 1908.

David's estate was 10 shares of 'Ewa Plantation stock. Furthermore, the power of attorney signed by all four heirs, the August 30, 1917 master audit report, and the August 30, 1917 probate court order accepting the report, all confirm that the Property was not part of David's probate estate subject to distribution. KLL argues that Defendants had an opportunity to dispute the Inventory and accounting, but did not do so.

For the following reasons, the omission of the Property in the probate Inventory does not govern whether the Property was part of David's estate.

First, the Inventory is merely "prima facie evidence of the property that has come to the possession, or under the control of the [administrator]." In re Gill's Estate, 2 Haw. 681, 688 (King. 1863) (Explaining that sworn inventories "are supposed to contain a full and true exhibit of the entire assets of the testator, whether they may have actually come to the possession of the executor or not[.]").

Second, the statute in effect in 1905 authorizing orders for the filing of inventories of the assets of a decedent's estate by an administrator did not require real property to be inventoried. In re Lopez' Estate, 19 Haw. 620, 623 (1909) ("The statute . . . authorizing orders 'for the filing of inventories of the assets' by the administrator does not require real estate to be inventoried and probably refers to . . . 'all the goods,

25

chattels and credits of the deceased coming to his possession.'" (citing RLH § 1850 (1905))).

Third, and most importantly, we note that under the law in effect in 1903, "[t]itle to real estate vest[ed] at once on the death of the owner in his heirs or devisees, and without an order of court." In re Kaiena's Estate, 24 Haw. 148, 148 (Terr. 1917); cf. id. (quoting 2 Schouler on Wills (5th ed.), § 1212) ("Real estate, at the common law, becomes vested at once on the death of the owner in his heirs, or devisees, and the executor or administrator has as such no inherent power over it."). See also In re Kekuewa, 37 Haw. 394, 397 (Terr. 1946) (stating that real property "ordinarily constitutes no part of the assets of administration"); Pahuilima v. Kela, 6 Haw. 573, 574 (King. 1885) (demonstrating that heirs at law succeed to possession of real property); Keahi v. Bishop, 3 Haw. 546 (King. 1874) (holding that where a probate court determines that a certain relationship exists without reference to title to real estate, a related party is entitled to use that decision for the purpose of getting possession of and defending himself in possession of real estate he or she inherits by such relationship); Rodrigues v. Char Fook, 29 Haw. 284, 286-87 (Terr. 1926) (holding that real estate of a decedent passes immediately upon death to the heirs or devisees, subject to any proceedings to satisfy the decedent's debts).

26

Thus, if there was no valid conveyance of the Property before David's death and if he had been vested with title when he died, his interest in the Property passed outside of probate as a matter of law to David's heirs at law, which the probate court determined to be Kenoiaina, Miliama, Pahukula, and Pua.[13]

**B.    The Lost Deed Doctrine Precludes a Finding That David Conveyed the Property Before His Death**

Defendants argued before the ICA that in order for KLL to claim title to 100% of the Property by adverse possession, KLL must prove the lost deed from David's alleged sale of the Property.[14]  Defendants argued that pursuant to Kapuniai v. Kekupu, 3 Haw. 560 (King. 1874), when an unrecorded lost deed is set up as the basis of title, a movant must allege sufficient facts to show clear proof of the execution of the deed and proof of its contents to enable the court to determine the character of the instrument.  (citing 3 Haw. at 561).  This is known as the "lost deed" theory or doctrine.  Defendants further argued that in asserting a lost deed theory, factors required to

---

[13]    Defendants contend that HRS § 560:3-1008 (2006) and Rule 86 of the Hawaiʻi Probate Rules, which permit the probate court to address newly discovered assets, "support the contention that property inadvertently left out of probate by mistake or inadvertence once discovered must be distributed."  As the Property would have passed outside of probate for purposes of administration pursuant to the law in effect at the time of David's death, the modern view of real property in probate is not pertinent.

[14]    As noted in note 10, supra, Defendants did not specifically rely on the statute of frauds.

27

support a movant's presumption for a lost conveyance include the following:

> [T]he length of time the land has been in the movant's possession, the completeness of the chain of conveyances of the land during the period under which the movant claimed, references in other earlier deeds tending to indicate that the title was out of the answering party's predecessor, and other facts tending to show the exclusive possession under claim of ownership on the part of the movant's predecessors.

(citing Brown v. Speckles, 18 Haw. 91, 93 (Terr. 1906)).

In response, KLL asserted that Defendants misapprehend and misapply the lost deed doctrine. KLL argued that its source of title is by adverse possession, not the lost deed, thus the lost deed theory does not apply as a matter of law.

In Kapuniai, the defendant in an ejectment action in possession of a disputed property asserted that Kapuniai, the last known owner, had given her late husband an unrecorded deed that had been lost. The territorial court of Hawai'i stated that to prove the lost deed,

> The law is undoubted that it will be necessary that there should be presented clear proof of the execution of the deed, and proof of its contents sufficient to enable the Court to determine the character of the instrument. This principle is so clear as not to need the citation of any authority.

3 Haw. at 561.

Subsequently, in Brown, the Supreme Court of the Territory of Hawai'i considered whether evidence adduced by defendants in support of their assertion of title by adverse possession was

28

sufficient to presume a lost grant to defendants' predecessors. The territorial court stated:

> When for a long period a plaintiff in ejectment and his predecessors have made no claim of title and the defendants and their predecessors have been in possession under claim of title, the court may, according to the circumstances, instruct the jury that they may or should presume a deed to the defendants' predecessor in order to quiet their possession and solve the difficulties, and in so doing the jury may consider what may have occurred as well as what may fairly be supposed to have actually occurred.

18 Haw. at 91. Although the lower court had instructed the jury on the presumption of a lost deed as requested, the defendants contended on certiorari that "the evidence was such that as a matter of law the court should have directed a verdict" in their favor. 18 Haw. at 107. The territorial court determined that "the evidence was such as to permit, if not require, the jury to find against the theory of a lost grant" because the purported period of adverse possession involved was only 38 years and the presumption was not based on a lost deed, but on a proved deed between defendants' predecessors that omitted part of the disputed land. Id.

In this case, KLL's assertion of a 100% interest in the Property based on adverse possession is completely dependent on the existence of a pre-death conveyance by David; KLL otherwise concedes that it is a cotenant with Defendants and that it cannot meet adverse possession requirements against Defendants as cotenants. We therefore reject KLL's assertion that it is not claiming adverse possession under the purportedly lost deed.

29

In other words, in arguing that the lost deed theory does not apply, KLL contends that it is not claiming an interest in the Property through the chain of paper title; however, KLL's adverse possession claim depends upon the purported existence of an unrecorded lost deed to an unidentified stranger. Thus, in order for KLL to claim title to 100% of the Property by adverse possession, it must establish the existence of the lost deed under the doctrine.

KLL has not put forth any evidence of the execution of the allegedly lost deed or its contents to enable this court to determine its character. In particular, no evidence has been adduced that indicates the grantee, the date of sale, or the consideration provided for the Property. The evidence is therefore insufficient, as a matter of law, to establish the lost deed under the doctrine, and KLL has failed to satisfy its burden to prove the existence of the purportedly lost deed.

## C. KLL and Defendants are Cotenants

In light of the fact that (1) there was no record of a conveyance by David to anyone before he died; (2) the existence of the purportedly "lost deed" has not been proven; (3) the purported grantee of the Property never attempted to assert his/her rights to the Property; (4) real property was not required to be included in an inventory of a decedent's estate; (5) under the law in effect at the time, "[t]itle to real estate

30

vest[ed] at once on the death of the owner in his heirs or devisees, and without an order of court[;]" and (6) three of David's heirs conveyed interests in the Property after David's death but during the probate proceedings while acknowledging that there was no real property in David's estate subject to distribution through probate, the evidence presented is not sufficient to establish that David was not vested with title to the Property when he died.  In re Kaiena's Estate, 24 Haw. at 148.  We therefore hold that title to the Property descended to David's heirs as a matter of law.

As the evidence put forth by KLL failed to establish the alleged break in the chain of record title, the ICA erred in concluding that the issue in the instant case was whether KLL could prevail on summary judgment by claiming superior title to Defendants through adverse possession when there is a shared break in the parties' chains of record title.  Ka'upulehu, mem. op. at 7.

KLL and Defendants each received their respective interests through the same chain of title.  KLL's interest stems from a series of conveyances starting with a conveyance by David's sister Miliama.  While Miliama only had a 1/4 interest to convey, KLL purportedly received an interest to 100% of the Property from Richard Smart, who himself had received only a 1/3 interest in the Property in 1961 from Joseph Iseke; thus the

31

basis of Iseke's 1/3 conveyance rather than 1/4 conveyance is unclear.

Despite having actual knowledge that he received only a fractional undivided interest in the Property, Richard Smart purported to convey a 100% interest in the Property to his Revocable Personal Trust in 1988. This purported conveyance occurred despite the existence of recorded deeds conveying (1) Kenoiaina's interest in the Property to McDougall in 1907, (2) Pua's interest in the Property to H.L. Holstein in 1908, and (3) H.L. Holstein's interest in the Property to McDougall in 1909. "Where one tenant in common makes a deed to the whole of the common property the deed conveys only his own interest and does not convey the interests of his cotenants[.]" Scott v. Pilipo, 24 Haw. 277, 282-83 (Terr. 1918). Moreover, "if real estate is held in common, and one tenant assumes to convey the entire land . . . , his deed will furnish color of title." Kalamakee v. Wharton, 16 Haw. 228, 234 (Terr. 1904). Applying and extending these legal precedents, Richard Smart's deed to his Revocable Personal Trust furnished mere color of title to the entire

32

Property as opposed to the paper title that KLL claims.  Thus, KLL received paper title to a 1/4 interest in the Property.[15]

Defendants, on the other hand, claim their interest in the Property through McDougall, whose interest stems from conveyances by Kenoiaina and Pua in 1907 and 1908.  There is no evidence in the record that McDougall asserted any rights to the

---

[15]    We note that the deeds conveying the Property from the Richard Smart Revocable Personal Trust to the Parker Land Trust, and then to KLL, describe the Property under an incorrect Land Commission Award (LCA) number (LCA 8098 as opposed to LCA 8723) and also by Tax Map Key (TMK) number.

"It is a well settled rule that descriptions of land in a deed must be reasonably certain, either by express language contained therein or by reference therein to some other deed or instrument or existing conditions capable of ascertainment."  Hayselden v. Lincoln, 24 Haw. 169, 172 (Terr. 1917).  In addition, "where a contradiction occurs in the description of land conveyed by grant, the false or mistaken part of the description may be rejected and effect given to the grant if the other parts of the description identify the land and do not conflict with the manifest intent of the parties."  Mist v. Kawelo, 11 Haw. 587, 590 (Rep. 1898) ("[I]f there be a description of the property clear and definite and sufficient to render certain what is to be demised, the addition of a wrong name or of an erroneous statement as to quantity, occupancy, locality or an erroneous enumeration of particulars, will have no effect.").

Interpreting the description of the Property in the deed, the TMK and LCA numbers provide conflicting descriptions that demonstrate a latent ambiguity.  Under established rules of construction, "the construction put upon a deed by the parties, as shown by their possession, is entitled to consideration in a case of latent ambiguity or of conflict between two descriptions and [] a deed should be construed most favorably to the grantee."  Ahmi v. Waller, 15 Haw. 497, 499 (Terr. 1904).  Stated differently, "if an ambiguity exists, the situation of the parties to the deed should be considered in determining their intention, and the intent so determined should be given effect if practicable."  State v. Hawaiian Dredging Co., 48 Haw. 152, 178, 397 P.2d 593, 608 (1964).  See also Lovejoy v. Lovett, 124 Mass. 270, 270 (Mass. 1878) (cited in 15 Haw. at 499) ("Parol evidence of the practical construction given to a deed by the subsequent acts of the parties thereto is admissible, when the language thereof, in the description of the land conveyed, is doubtful").

Based on record evidence of a survey map and the above-mentioned deeds, LCA number 8098 refers to a parcel adjacent to the subject property that Richard Smart also owned.  Following established rules of construction, if the TMK used to convey the Property is correct, the description taken as a whole shows an intent to convey the subject property, such that the deeds would be construed as valid.

Property.  Moreover, McDougall died intestate in 1935 and the Property did not appear in the "Inventory of the First and Final Account of the Estate of McDougall," nor does it appear that McDougall conveyed his interest in the Property.  Therefore, if the Property was in McDougall's estate when he died, Defendants have paper title to half of the Property as descendants of McDougall.[16]

The issues in this case are purely issues of law, which we resolve as follows:  (1) we hold as a matter of law that title to the subject property descended in accordance with the law in effect at the time of David's death in 1903 to David's heirs; (2) we further hold that Defendants and KLL are cotenants, having received undivided fractional interests through mesne conveyances stemming from David as a common grantor. Accordingly, the ICA erred in finding that there was a genuine issue of material fact with respect to the existence of a cotenancy.

## D.   KLL's Adverse Possession Claim Fails Against Its Cotenants

"In an action to quiet title, the burden is on the plaintiff to prove title in and to the land in dispute, and,

---

[16]    As of 1935, the time of McDougall's death, real property still vested on the death of the owner in his heirs or devisees, without a court order.  According to In re Kekuewa, even as of 1946, real property "ordinarily constitutes no part of the assets of [a probate] administration." 37 Haw. at 397.

absent such proof, it is unnecessary for the defendant to make any showing." Maui Land & Pineapple Co. v. Infiesto, 76 Hawai'i 402, 407, 879 P.2d 507, 512 (1994) (citing State v. Zimring, 58 Haw. 106, 110, 566 P.2d 725, 729 (1977)). "The plaintiff has the burden to prove either that he has paper title to the property or that he holds title by adverse possession." 76 Hawai'i at 408, 879 P.2d at 513 (citations omitted). "While it is not necessary for the plaintiff to have perfect title to establish a prima facie case, he must at least prove that he has a substantial interest in the property and that his title is superior to that of the defendants." Id.

KLL seeks to quiet title on the Property on the basis of adverse possession. Hawai'i Revised Statutes (HRS) § 669-1(b) (1993) states in relevant part:

> Action for the purpose of establishing title to a parcel of real property of greater than five acres may be brought by any person who had been in adverse possession of the real property for not less than twenty years prior to November 7, 1978, or for not less than earlier applicable time periods of adverse possession. For purposes of this section, any person claiming title by adverse possession shall show that such person acted in good faith. Good faith means that, under all the facts and circumstances, a reasonable person would believe that the person has an interest in title to the lands in question and such belief is based on inheritance, a written instrument of conveyance, or the judgment of a court of competent jurisdiction.

"Between 1898 and 1973, the statutory period for establishing title to real property by adverse possession was ten years." Wailuku Agribusiness, 114 Hawai'i at 33 n.19, 155

35

P.3d 1125, 1134 n.19 (citations omitted). KLL received its interest in the Property in 2004. This court has held, "[W]here there is such a privity of estate or title as that the several possessions can be referred to the original entry, they may be joined and are regarded as a continuous possession[.]" Kainea v. Kreuger, 31 Haw. 108, 108 (Terr. 1929). Title to Miliama's interest in the Property descends straight and unbroken to KLL from the Joseph Iseke to Richard Smart conveyance in 1961. Thus, to establish adverse possession, KLL must prove that its predecessors in interest met the elements of adverse possession for either a ten year period between 1961 to 1973 or for a twenty year period prior to 1978.[17]

"In order to establish title to real property by adverse possession, a claimant must bear the burden of proving by clear and positive proof each element of actual, open, notorious, hostile, continuous, and exclusive possession for the statutory period." Wailuku Agribusiness, 114 Hawai'i at 33, 155 P.3d at 1134 (internal quotation marks, citations, and brackets omitted). KLL asserts that it "provided uncontroverted evidence that it has been in actual, open, notorious, continuous,

---

[17]    We note that in 1978, the period of adverse possession was extended from ten to twenty years and additional restrictions were placed on claims to five acres or more. See Haw. Const. art. XVI, § 12; HRS § 657-31.5 (1993).

36

exclusive, and hostile use and possession of the Property and has paid the property taxes thereon since 1961."

"Actual, open, and notorious possession is established where a claimant shows use of the land to such an extent and in such a manner as to put the world on notice by means so notorious as to attract the attention of every adverse claimant." Wailuku Agribusiness, 114 Hawaiʻi at 33, 155 P.3d at 1134 (internal quotation marks, brackets, and citations omitted). "Continuity and exclusivity of possession require that the adverse possessor's use of a disputed area . . . rise to that level which would characterize an average owner's use of similar property." 114 Hawaiʻi at 34, 155 P.3d at 1134-35 (internal quotation marks and citations omitted). Based on the declarations from Hewitt, Kawamoto, Holt, Richards, and Metzler, KLL met its burden of proving that its predecessors had actual, open, notorious, continuous, and exclusive possession of the Property since 1961; however, KLL has not met its burden of proving "hostile possession."

This court has held, "where a cotenancy exists there is a special burden in proving hostile possession that requires the cotenants making a claim of adverse possession to show that they had acted in good faith in relation to their cotenants." Wailuku Agribusiness, 114 Hawaiʻi at 34, 155 P.3d at 1135 (internal quotation marks and citations omitted). "In most

37

circumstances, this requirement of good faith will in turn mandate that the tenant claiming adversely must actually notify his cotenants that he is claiming against them." City & Cnty. of Honolulu v. Bennett, 57 Haw. 195, 209, 552 P.2d 1380, 1390 (1976). This court has held, however, that good faith is satisfied by less than actual notice in the following exceptional circumstances:

> where the tenant in possession has no reason to suspect that a cotenancy exists; or where the tenant in possession makes a good faith, reasonable effort to notify the cotenants but is unable to locate them; or where the tenants out of possession already have actual knowledge that the tenant in possession is claiming adversely to their interests.

Id. This court further held, "[i]n these limited circumstances, the notice requirement will be satisfied by constructive notice and 'open and notorious possession[.]'" 57 Haw. at 209-10, 552 P.2d at 1390.

In this case, KLL's predecessors, namely Richard Smart, had reason to suspect that a cotenancy existed as of 1961. The deed from Joseph Iseke to Richard Smart contains the first mention of "a 1/3 undivided interest." It therefore appears that Joseph Iseke knew that he may have received only a fractional undivided interest from Sam.[18] Thus, Richard Smart could not, in good

---

[18] It is unclear where the concept of a 1/3 interest originated as the four heirs would have each received a 1/4 undivided interest through intestate succession. Arguably, Joseph Iseke may have become aware that his interest in the Property was a fractional undivided interest after viewing the other recorded deeds.

38

faith, provide the cotenants with less than actual notice, which KLL has admitted it is unable to prove. See Wailuku Agribusiness, 114 Hawaiʻi at 34, 155 P.3d at 1135 ("[A] finding of bad faith may be inferred from evidence that the cotenant in possession ought to have known that there existed a cotenancy." (internal quotation marks, citations, and brackets omitted)). In addition, the other "exceptional circumstances" are also inapplicable to this case.

KLL's alternative claim of paper title is therefore the only basis on which it can claim an interest in the Property. KLL has not shown that its title to the Property is superior to that of Defendants and has therefore failed to establish that it is entitled to judgment. Accordingly, the circuit court erred in granting summary judgment in KLL's favor.

**E. The Case Must Be Remanded for a Determination of Pahukula's Interest**

Based on our holding that title descended to David's heirs, David's brother Pahukula received a 1/4 undivided interest in the Property. Pahukula died intestate without conveying his interest in the Property, and without a probate proceeding over his estate or a judicial determination of his heirs. The only record evidence of Pahukula's heirs is a deed conveying an unrelated Maui property to his son in 1910. Pahukula's heirs or successors in interest were named in KLL's Complaint and

39

publication summons, but did not appear in the case.  We therefore remand this case to the circuit court with instructions for a determination of Pahukula's interest in the Property.

In this regard, we note two additional issues that may become relevant on remand.  First, KLL asserts that, as owner of the surrounding lands, Pahukula's interest escheats to KLL.  Under Hawaiʻi law prior to 1977, the interest of an owner of a kuleana who died intestate or partially intestate without any takers escheated to the ahupuaʻa or ili owner.  In re Kekuewa, 37 Haw. at 395; HRS § 532-15 (1968) (repealed 1987).  KLL's assertion regarding Pahukula is without merit, as the record reflects that Pahukula had a son to whom he conveyed property on Maui.  This pre-1977 law, however, could become relevant if Pahukula's heirs died intestate without any takers and the law was still in effect at that point in time.

In 1977, this law was superseded by the Uniform Probate Code, which provided for escheat to the State.  HRS § 2-105 (1985) ("If there is no taker under the provisions of this Article, the intestate estate passes to the State.").  In 1987, the provision was further amended to provide for escheat to the State of Hawaiʻi, Department of Land and Natural Resources to hold in trust for the Office of Hawaiian Affairs (OHA).  1987 Haw. Sess. Laws Act 307, § 1 at 961-62; HRS § 560:2-105.5

(2006).[19]  In this case, OHA was named as a defendant pursuant to HRS § 669-2(e) (1993), which provides in relevant part that in any action to quiet title under HRS § 669-1, OHA shall be joined as a defendant when:

> (1) The land claimed by the plaintiff is kuleana land; and
>
> (2) The plaintiff has reason to believe that an owner of an inheritable interest in the kuleana land died intestate or died partially intestate and there is or was no taker under article II of the Hawaii uniform probate code.
>
> For purposes of [subsection e], "kuleana land" means that land granted to native tenants pursuant to L 1850, p. 202, entitled "An Act Confirming Certain Resolutions of the King and Privy Council, Passed on the 21st Day of December, A.D. 1849, Granting to the Common People Allodial Titles for Their Own Lands and House Lots, and Certain Other Privileges", as originally enacted and as amended.

KLL argued before the circuit court that OHA does not have an interest in the Property because its interest "would arise only if an owner of an inheritable interest in the Property died intestate or partially intestate and there were no takers of

---

[19]  HRS § 560:2-105.5 provides:

Any provision of law to the contrary notwithstanding, if the owner of an inheritable interest in kuleana land dies intestate, or dies partially intestate and that partial intestacy includes the decedent's interest in the kuleana land, and if there is no taker under article II, such inheritable interest shall pass to the department of land and natural resources to be held in trust until [OHA] develops a land management plan for the use and management of such kuleana properties, and such plan is approved by the department of land and natural resources. Upon approval, the department of land and natural resources shall transfer such kuleana properties to [OHA]. For the purposes of this section, "kuleana lands" means those lands granted to native tenants pursuant to L. 1850, p. 202, entitled "An Act Confirming Certain Resolutions of the King and Privy Council Passed on the 21st Day of December, A.D. 1849, Granting to the Common People Allodial Titles for Their Own Lands and House Lots, and Certain Other Privileges", as originally enacted and as amended.

41

such inheritable interest[.]" Therefore, on remand, the circuit court must determine whether there were any takers of Pahukula's interest, and if none, whether escheat applies and to whom Pahukula's interest would escheat.[20]

Accordingly, we remand this case to the circuit court for a determination of Pahukula's interest in the Property.

## V.    Conclusion

Accordingly, we vacate the ICA's January 9, 2014 Judgment on Appeal and the circuit court's March 25, 2010 Final Judgment,

---

[20]    In addition, we note that in quieting title, there may be an issue as to whether Pahukula's interest in the Property was advanced to him pursuant to RLH § 2116 (1898), which provides as follows:

> If any child of an intestate shall have been advanced by him by settlement or portion of real or personal estate, or of both of them, the value thereof shall be reckoned, for the purposes of this section only, as part of the real and personal estate of such intestate, descendible to his heirs and to be distributed to his next of kin according to law. And if such advancement be equal or superior to the amount or share which such child would be entitled to receive of the real and personal estate of the deceased as above reckoned, then such child and his descendants shall be excluded from any share in the real and personal estate of the intestate.

Due to the fact that (1) Pahukula's recorded conveyance to his son conveys his "undivided interest in the estate of [his] father/uncle Kahoiwai[,]" and specifically mentions his undivided interest in the Maui property; (2) David received the Property by deed from his father Kahoiwai; and (3) Pahukula did not convey an interest in the Property while the other three heirs did, there may be a question as to whether Pahukula was advanced his interest in the Property. In that case, Defendants would share a 2/3 interest, while KLL would have a 1/3 interest in the Property.

and remand this case to the circuit court for further

proceedings consistent with this opinion.

Steven S.C. Lim and          /s/ Mark E. Recktenwald
Arsima A Muller
for petitioner              /s/ Paula A. Nakayama

Camille K. Kalama and        /s/ Sabrina S. McKenna
David K. Kopper
for respondents           /s/ Richard W. Pollack



                           /s/ Richard K. Perkins